**Hector IBARRA, Plaintiff,**

v.

**HOUSTON INDEPENDENT SCHOOL DISTRICT, Dr. Roderick Paige, and Dr. Johnny Brown, in their individual and official capacities, Defendants.**

No. Civ.A.H 97–2953.

United States District Court,
S.D. Texas,
Houston Division.

May 10, 1999.

Larry Watts, Watts & Associates, Houston, TX, for plaintiff.

Chris Borreca, Ron Scott, Bracewell & Patterson, L.L.P., Houston, TX, for defendants.

### MEMORANDUM AND ORDER

WERLEIN, District Judge.

Pending is Defendants' Motion for Summary Judgment (Document No. 11) to which Plaintiff has filed a Response (Document No. 12). After carefully considering the motion, the response, the reply, and the applicable law, the Court concludes, for the reasons set forth herein, that Defendants' motion should be GRANTED.

#### I. *Factual Background*

Plaintiff Hector Ibarra ("Ibarra") was employed as the District Superintendent for the Houston Independent School District's ("HISD") East District from January 6, 1995 through January 5, 1996. Defendant Dr. Roderick Paige was HISD's Superintendent of Schools during Ibarra's tenure of employment and Defendant Dr. Johnny Brown was the Executive Deputy Superintendent for School Operations and Ibarra's direct supervisor.

HISD hired Ibarra pursuant to a one-year probationary contract. (Document No. 11, Exhibit A–1). Upon the expiration of the one-year probationary period, Dr. Paige notified Ibarra that he would not recommend the contract's renewal. Con-

sequently, Ibarra's employment with HISD ceased on January 5, 1996.

However, to ease the transition to other employment, Dr. Paige offered Ibarra a short-term consulting position—from January 8, 1996 though January 11, 1996—and stated that he would recommend at the January 11, 1996, HISD Board of Education (hereinafter the "Board") meeting that the Board authorize another consulting agreement with Ibarra through March 8, 1996. Both consulting agreements were contingent upon Ibarra signing a separate Waiver and Release Agreement waiving and releasing any and all claims related to his employment with HISD. Ibarra signed the release on January 5, 1996, but then canceled the meeting scheduled for January 8, 1996, to work out the details of the consulting arrangement.

Ibarra filed the instant lawsuit on August 28, 1997, alleging that the nonrenewal of his contract violated numerous provisions of the Texas and the United States Constitutions. Specifically, Ibarra alleges that his contract was not renewed (a) because of his sex; (b) in retaliation for associating publicly with various local and state politicians; and (c) in retaliation for speaking out about matters of public concern, in particular on issues related to Austin High School and the Houston Federation of Teachers (the local teachers' union). Ibarra also alleges that he was terminated without notice and without a meaningful opportunity to be heard, in violation of his state and federal procedural and substantive due process rights. Defendants respond that all of Plaintiff's claims are barred by the release signed on January 5, 1996, and alternatively, that no constitutional violations occurred. Defendants have moved for summary judgment on all claims.

#### II. *The Summary Judgment Standard*

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The moving party must "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. *See id.* at 2553–54. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. *See Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986)). "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Id.*

In considering a motion for summary judgment, the district court must view the evidence through the prism of the substantive evidentiary burden. *See Anderson*, 106 S.Ct. at 2513–14. All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. *Kelley v. Price–Macemon, Inc.*, 992 F.2d 1408, 1413 (5th Cir.1993) (citing *Matsushita*, 106 S.Ct. at 1351). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." *Id.* (citing *Anderson*, 106 S.Ct. at 2511). Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." *Anderson*, 106 S.Ct. at 2513.

### III. *Defendants' Evidentiary Objections (Document No. 13)*

1. Defendants' objections to hearsay statements that are not supported by summary judgment evidence, on pages 9, 11, and 12 of Plaintiff's Response, are SUSTAINED.

2. Defendants' hearsay objection to Plaintiff's discussion of the contents of a letter distributed by Dr. Debbie Savage, is SUSTAINED, insofar as the letter is relied upon to prove the truth of the statements made in the letter. The letter is admissible and properly considered, however, for the limited purpose of showing the basis of a conversation between Dr. Paige and Plaintiff, which is established in the summary judgment evidence.

3. Defendants' objections to the entirety of the affidavits of William R. Morris, Manuel Rodriguez, and Guadalupe Miguel, Jr., as hearsay, are OVERRULED.

### IV. *Discussion*

#### A. *The Release*

"Public policy favors voluntary settlement of claims and enforcement of releases, but a release of an employment or employment discrimination claim is valid only if it is 'knowing' and 'voluntary.'" *Williams v. Phillips Petroleum Co.*, 23 F.3d 930, 935 (5th Cir.1994) (internal citations omitted). An employer seeking the enforcement of a release bears the initial burden of showing that the former employee signed a release, received due consideration, and then breached the release. *Id.* The burden then shifts to the former employee to demonstrate that the release is invalid because of fraud, duress, material mistake, or some other defense. *Id.*

In this case, Defendants have produced a copy of a release signed by Plaintiff and by Dr. Paige on behalf of HISD. (Document No. 11, Exhibit A–2). The release states that in consideration of the District's promise to employ Ibarra as a consultant for the period of January 8, 1996, through January 11, 1996, and to

further employ Ibarra through the period up to May 10, 1996 (pending HISD Board approval) Ibarra

> waives and relinquishes any and all claims, demands, and causes of action, in law or equity, statutory, common law or otherwise, of continued and/or future employment with the District and releases, acquits, and forever discharges the District, its past, present, and future trustees, officers, directors, employees, agents, servants, representatives, insurors, assigns, and affiliated entities, individually and officially, from any and all claims, demands, and causes of action of whatever nature, in law or equity, statutory, common law or otherwise, which Mr. Ibarra might ever have had, known or unknown at this time, from the beginning of time through the last date of his consultant contracts, including those arising out of, or in any way related to, his employment in any capacity with the District.

*Id.*

Without any summary judgment evidence, Ibarra argues that the release is unenforceable because he did not sign it voluntarily and he was under duress when he signed it. (Document No. 12, ¶ 14, Response). The uncontroverted affidavits of Michael Jimenez, Deputy Superintendent of Human Resources, Dr. Paige, and Dr. Brown (Document No. 11, Exhibits A, B, and C), however, deflect any claim that the release was wrongfully obtained.

Jimenez states that on January 5, 1995, a meeting was held with Ibarra. *Id.* at Exhibit A, ¶ 5. At that meeting, Paige informed Ibarra that he would not be recommending the renewal of his contract, but would allow Ibarra to continue working for the District under a 60–day consultant's agreement. *Id.* Jimenez states that after Paige left the room, he explained to Ibarra that the consultant's agreement was contingent upon his signing a waiver and release agreement. *Id.* Jimenez states that Ibarra then reviewed the release agreement and objected to certain of its terms. *Id.* After meeting with Paige, Jimenez in-formed Ibarra that Ibarra's requested modifications would be made. *Id.* After receiving oral confirmation from Jimenez that his requested changes in the Waiver and Release Agreement would be made, Ibarra left the HISD office at about 12:30 p.m., stating that he would return to sign the rewritten agreement at 2:00 p.m. Ibarra did return to the school district at approximately 3:00 p.m. and met again with Jimenez, who presented to Ibarra the new version of the Waiver and Release Agreement. Ibarra read it in its entirety, stated he was in agreement with its terms, signed the Waiver and Release, and thanked Jimenez for making the changes that Ibarra had requested. *Id.*

Ibarra has cited no summary judgment evidence controverting these facts. It is therefore uncontroverted that Ibarra reviewed the proposed release agreement, negotiated for several modifications, and then voluntarily returned to HISD's offices about three hours later to read again and execute the modified document. In sum, there is absolutely no evidence to raise a fact issue on any claim that the release was signed under duress or was not signed voluntarily. Moreover, there is no evidence that Ibarra ever notified the District of the deficiencies now alleged, or that he ever repudiated the release on the basis that it was not voluntarily executed or was obtained under duress. *See, e.g., Blakeney v. Lomas Info. Sys., Inc.,* 65 F.3d 482, 485 (5th Cir.1995) (concluding that defective release is voidable and may be rescinded by restoring the *status quo ante* and returning consideration shortly after discovery of the alleged deficiency). Although Ibarra failed subsequently to take the action necessary on his part to complete and to perform the consultant's agreement, the uncontroverted summary judgment evidence demonstrates that the release itself was knowingly and voluntarily executed and supported by consideration—the District's promise of additional short-term employment. The comprehensive language of the release therefore bars all of Ibarra's claims asserted in this lawsuit,

filed a year and a half later, arising out of his employment with HISD.

Notwithstanding the validity of the release, the Court has also considered Ibarra's federal and state constitutional claims, and concludes that even if Ibarra had not released his claims, Defendants still would be entitled to summary judgment on the merits of those claims under the standard set forth in Fed.R.Civ.P. 56.

### B. *42 U.S.C. § 1983 and Ibarra's Federal Constitutional Claims*

Title 42, Section 1983 ("Section 1983") provides that "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...." It is axiomatic that to establish a claim under § 1983, the aggrieved party must first demonstrate the deprivation of a constitutional right or a right secured by law. *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979). Ibarra alleges that the nonrenewal of his employment contract was in violation of the First and Fourteenth Amendments of the United States Constitution.

#### 1. *Fourteenth Amendment Due Process Claim*

■ To succeed on either a substantive or procedural due process claim under the United States Constitution, there must be a demonstration of a protected property interest in continued employment. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). Whether a plaintiff possesses a protected property interest is determined by reference to "existing rules or understandings that stem from an independent source such as state law...." *Id.* (quoting *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). Generally, a property interest may be secured by a specific statutory provision, a formal contract, a

mutually explicit understanding between the employee and the institution, or a specific practice that the institution maintains. *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972).

■ Because Ibarra's contract expired by its own terms on January 5, 1996, the language of the contract itself does not confer on Ibarra a protected property interest. *See also Bowen v. Calallen Indep. Sch. Dist.,* 603 S.W.2d 229, 235 (Tex.Civ. App.—Corpus Christi 1980, writ ref'd n.r.e.) (stating that "failure to renew is not tantamount to dismissal or discharge because a contract for a specified length of time automatically expires at the end of the term"). Further, Ibarra was hired under a probationary contract. (Document No. 11, Exhibit A–1, District Superintendent's Probationary Contract). The Texas courts have held, as a matter of law, that a teacher working under a probationary contract does not have a cognizable property interest in continued employment. *Carey v. Aldine Indep. Sch. Dist.,* 996 F.Supp. 641, 651 (S.D.Tex.1998) (citing *McCullough v. Lohn,* 483 F.2d 34, 34 (5th Cir.1973)). Finally, to the extent that Ibarra is relying on the Texas Term Contract Renewal Act ("TCNA"), Tex.Educ. Code Ann. §§ 21.201–21.211, the protections afforded under the TCNA do not extend to probationary administrators. Tex.Educ.Code Ann. § 21.213; *see also* (Document No. 11, Exhibit B–1, HISD Board Policy § 541.100 on Administrator Term Contracts) (stating that TCNA does not apply to administrators hired under probationary contracts). Moreover, Ibarra expressly waived any claim that might arise under the TCNA in his employment contract and agreed not to contest the proposed nonrenewal of his probationary contract in *any administrative or judicial forum* in exchange for a higher salary. (Document No. 11, Exhibit A–1, ¶ 8) (emphasis added). Because there is no evidence that Ibarra possessed a protected property interest in continued employ-

ment, Defendants are entitled to summary judgment on Ibarra's procedural and substantive due process claims.

### 2. *First Amendment Freedom of Speech Claim*

 The First Amendment prohibits infringement of protected free speech rights by governmental entities or by "state actors" whose conduct is "fairly attributable" to the government. *See Yeager v. City of McGregor*, 980 F.2d 337, 339 (5th Cir.1993). In the public employment context, in order to establish a First Amendment claim, (1) the speech at issue must involve a matter of public concern; (2) the governmental employee's interest in commenting upon matters of public concern must outweigh the defendants' interest in promoting the efficiency of the public services that they perform;[1] and (3) the employee's speech must have motivated the defendants' decision to take the adverse employment action. *Board of County Comm'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668, 116 S.Ct. 2342, 2347, 135 L.Ed.2d 843 (1996); *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 1737–38, 20 L.Ed.2d 811 (1968); *Thompson v. City of Starkville, Miss.*, 901 F.2d 456, 460 (5th Cir.1990).

In the instant action, the speech, including instances of expressive conduct, alleged to enjoy First Amendment protection is essentially twofold: (a) Ibarra's public support of a parents' group in the East District concerned about the overcrowding problem at Austin High School, and in particular, Ibarra's refusal to dissuade the group from confronting the HISD Board; and (b) Plaintiff's "voiced objections" to Paige's position regarding the local teachers' union. (Document No. 12, Response, at 3–4 & 9–13).

### a. *The Austin High School Overcrowding Problem*

 During Ibarra's tenure as District Superintendent, a group of parents and other concerned citizens in the East District community formed an organization, which they called "The Resolution Committee," seeking solutions to the overcrowding problem at Austin High School. In October 1995, Ibarra arranged a meeting between the group and Paige to discuss the situation. The group subsequently appeared at the December 14, 1995, Board meeting and requested funding for an additional building to house the excess students. Ibarra now claims that his employment contract was not renewed because he refrained from stopping the group from appearing before the HISD Board. To this end, Ibarra alleges that after the October 1995 meeting, that both Paige and Brown told him to "keep a lid" on the complaints, and "to keep [the complaints] from coming to the board."[2] (Document No. 12, Exhibit B, at 118).

In *Jones v. Collins*, 132 F.3d 1048, 1054 (5th Cir.1998), the Fifth Circuit acknowledged that silence in the face of an illegitimate demand for speech is subject to First Amendment protection as expressive conduct. (citing *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977)). However, the Fifth Circuit has explained that

[f]or activities to constitute expressive conduct and fall within the scope of the First Amendment, they must be 'sufficiently imbued with elements of communication.' In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we ask whether an intent to convey a particularized message was present and whether the likelihood was great that

---

1. The public employer bears the burden of coming forth with evidence on this point. *Thompson v. City of Starkville, Miss.*, 901 F.2d 456, 461 n. 4 (5th Cir.1990).

2. For purposes of this analysis, the Court accepts Plaintiff's contention that the overcrowding situation at Austin High School was a matter of public concern.

the message would be understood by those who viewed it.

*Cabrol v. Town of Youngsville,* 106 F.3d 101, 109 (5th Cir.1997) (internal citations omitted).

The only specific request made of Ibarra was to "keep a lid" on the complaints and to discourage the group from approaching the HISD Board with their complaints. In and of itself, Paige's request that Ibarra respond to the group's concerns and to handle the matter in a manner consistent with the administration's position, without involving the Board, is not an illegitimate request for speech.

Moreover, there is no indication that (a) Ibarra intended his silence in the face of Paige's request to constitute a public statement, or (b) that anyone, including Paige, interpreted the group's statements at the December 14, 1995, Board meeting as a *public* statement by Ibarra on the over-crowding situation at Austin High School. Indeed, other than generally protesting that he was powerless to stop the parent group from approaching the Board, there is no proof that Ibarra told Paige that he would not handle the situation or other-wise affirmatively made it known that he intended by his silence to convey a public statement on the issue.[3] *Id.* at Exhibit C, at 10 & 60. *Compare Nicholson v. Gant,* 816 F.2d 591, 599 (11th Cir.1987) (conclud-ing that plaintiff had engaged in First Amendment speech where she positively expressed desire not to read statement in support of supervisor's re-election bid at political rally); *Sykes v. McDowell,* 786 F.2d 1098, 1104 (11th Cir.1986) ("A public employee who *positively asserts* the right to speak when ordered to support his em-ployer [politically] is within the protection of the first amendment.") (emphasis add-ed). Furthermore, his "going with the parent group to Paige and before the Board" fails to create the necessary infer-ence that he "raised criticisms in a manner calculated to attract the attention of the public." (Document No. 12, at 15). Ibarra was responsible for interacting with the Resolution Committee and personally ar-ranged an October 1995 meeting between the group and Paige. *Id.* at 13 & 63. His mere appearance at the HISD board meet-ing when the parents group attended is insufficient to constitute First Amendment expressive conduct, especially in light of the fact that Ibarra was required to attend all HISD board meetings, not just the December 14, 1995, meeting. (Document No. 12, Exhibit B, at 145).

Assuming, however, that Ibarra's failure to speak did constitute expressive conduct on a matter of public concern, Ibarra's sympathy with the parents group and fail-ure to dissuade the parents group from appearing before the HISD Board does not outweigh HISD's interest in providing educational services to HISD's school chil-dren and, toward that end, having a high ranking East District superintendent who effectively represents HISD's Superinten-dent and HISD's policies in the East Dis-trict. *See Wooley,* 97 S.Ct. at 1432 (apply-ing *Pickering* balancing test in expressive conduct case).

The Fifth Circuit has recognized that where a close working relationship is es-sential to fulfilling the public employee's public responsibilities, the government's interest more easily outweighs the employ-ee's interest as a private citizen. *Kinsey v. Salado Indep. Sch. Dist.,* 950 F.2d 988, 994 (5th Cir.1992); *McBee v. Jim Hogg County, Tex.,* 730 F.2d 1009, 1016–17 (5th Cir.1984) (en banc). One court has ex-plained the policy considerations as fol-lows:

> High-level officials must be permitted to accomplish their organizational objec-tives through key deputies who are loy-al, cooperative, willing to carry out their superiors' policies, and perceived by the public as sharing their superiors' aims; this is true whether or not those officials are elected.

---

**3.** Ibarra states that Paige never instructed him on how he was "to keep a lid on [the complaints]" other than just to "take care of it." (Document No. 12, Exhibit C, at 10 & 14).

*Hall v. Ford,* 856 F.2d 255, 263 (D.C.Cir. 1988).

Ibarra was a District Superintendent and was responsible for representing the administration to the East District community. Ibarra himself describes his role as "a spokesman on matters relating to the school district," (Document No. 11, Exhibit E, at 64), and acknowledges in his Response that he occupied a confidential position in Paige's administration. (Document No. 12, Response, at 18). For example, Ibarra was a member of Paige's "cabinet," which met bi-monthly to "flush out ... ideas and plan activities and identify priorities." (Document No. 12, Exhibit C, at 144); *see also Gonzalez v. Benavides,* 712 F.2d 142, 149 (5th Cir.1983) (recognizing that in determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals). The totality of this uncontroverted summary judgment evidence demonstrates that a close working relationship with Paige was a function of the particular public responsibilities attendant to the District Superintendent position.

Given Ibarra's high position in the administration, the next inquiry is "whether the particular speech [and other conduct] sufficiently disrupted the working relationship as to prevent effective performance, *requiring a stronger showing of disruption as the employees' speech moves closer to core 'public concerns.'" Kinsey,* 950 F.2d at 994 (emphasis in original) (quoting *Connick*). "In assessing such disruptive effect, the court should consider 'the time, place and manner of the ... activity' and 'whether, taken in context, the particular activity should be considered sufficiently hostile, abusive, or insubordinate, as to disrupt significantly the continued operation of the office.'" *Id.*

The summary judgment evidence demonstrates that while Ibarra's speech and conduct was neither abusive nor hostile, his failure to cooperate with Paige or to achieve Paige's objectives on key issues undermined their working relationship and caused Paige to doubt Ibarra's ability effectively to represent the administration in the East District. *See Connick,* 103 S.Ct. at 1692–93 (considering disruptive effect of speech as factor in *Pickering* balance test). Paige explains: "[I]t was my judgment that our ability to carry out our responsibility to improve schools could best be done if we changed leadership in the east district.... I think I would have preferred an advocate for the district's position or to recruit persons there to support the district, to not inflame matters that would be negative toward the district or to decrease conflict. All those kinds of thing that you would want your representative, your first lieutenants to do." (Document No. 12, Exhibit C, at 170 & 172).

In sum, Paige relied on Ibarra to express the administration's position on the overcrowding at Austin High School and to assist him in the implementation of the administration's policies and philosophies in the schools. Ibarra's failure in this regard made an "effective relationship" with HISD, and Paige in particular, difficult, if not impossible. *Kinsey,* 950 F.2d at 996. In the end, Ibarra's public expression of opposition to Paige was his "choice to make, ... [b]ut, in so doing, he abandoned any shelter otherwise provided him by the First Amendment." *Kinsey,* 950 F.2d at 996. For all these reasons, Ibarra's refusal or inability to handle the East District parents group in the manner Paige requested, that is, in a manner consistent with the administration's position on the overcrowding issue, does not warrant First Amendment protection, and will not support his Section 1983 claim.[4]

4. Alternatively, even if there were sufficient evidence to establish a genuine issue of fact that Ibarra's conduct was protected by the First Amendment, both Brown and Paige would still be entitled to qualified immunity on this claim because the right to engage in

speech of this nature was not clearly established at the time of the alleged violation. *See Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1051 n. 10 (5th Cir.1996). That is, in light of the close working relationship required be-

### b. *Ibarra's Defense of the Local Teachers' Union*

Ibarra also alleges that he was terminated because of his disagreement with Paige regarding the teachers' union and his vocalized opposition to Paige's suggestion to impose involuntary transfers on teachers to improve faculty and administrative relationships in a particular school. (Document No. 12, Exhibit B, at 6–7; 136–44). Defendants respond that such speech is not protected because it does not address a matter of public concern and even if it did, that it was unrelated to the decision not to renew Ibarra's employment contract.

■■■ The determination of whether a statement constitutes a matter of public concern is a legal question to be determined by the Court from the "content, form, and context" of the statement as revealed by the whole record. *Connick,* 103 S.Ct. at 1690 & n. 7; *Terrell v. University Of Tex. Sys. Police,* 792 F.2d 1360, 1362 (5th Cir.1986). A statement will be deemed a matter of public concern if it is found that the public employee is speaking as a citizen versus as an employee upon a matter only of personal interest. *Terrell,* 792 F.2d at 1362. However, "a matter 'not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest.'" [5] *Kirkland v. Northside Indep. Sch.*

*Dist.,* 890 F.2d 794, 799 n. 11 (5th Cir.1989) (quoting *Connick* ).

■■■ The "content, form, and context" of Ibarra's speech illustrates that Ibarra's statements about the union relate only to his personal interest as an employee. Most significantly, Ibarra's primary motivation for engaging in such speech was in defense of his management philosophy and in response to union-related problems in his district. *See Dorsett v. Board of Trustees for State Colleges and Univs.,* 940 F.2d 121, 124 (5th Cir.1991) (assessing employee's "primary motivation" in engaging in speech).

The central incident cited by Ibarra in support of his claim is a private conversation with Paige about a copy of a memorandum authored by Dr. Debbie Savage, the union steward at Austin High School, that Paige received from a Board member. (Document No. 12, Exhibit D–1, Memorandum). Paige confronted Ibarra to express his concern that the union steward, without input or authority from the principal at Austin High School, was dictating orders to the teachers. (Document No. 12, Exhibit C, Paige's testimony at 147–48; Exhibit B, Ibarra's testimony at 116). Ibarra in turn responded to Paige's comments with a general statement in support of the union.[6]

Although Ibarra attempts in his Response and in his testimony in the related

---

tween Paige and his district superintendents, the decision not to renew Ibarra's contract based on the perception that Ibarra failed adequately to represent the administration in the East District is not a violation of a "clearly established" right to free speech.

**5.** The Fifth Circuit has recognized two specific areas of speech in the public employment context that implicate matters of public concern—the reporting of corruption or serious wrongdoing to higher authorities. There is no evidence that Ibarra's speech falls into either category. *Compare Wilson v. UT Health Ctr.,* 973 F.2d 1263, 1266 (5th Cir. 1992) (reporting sexual harassment to supervisors was matter of public concern) *with Wallace,* 80 F.3d at 1050–51 (advising African–American basketball players of their eligi-

bility for financial assistance not a matter of public concern).

**6.** Ibarra explains the encounter as follows: "He [Paige] asked the question, if the principal was part of the problem or part of the solution, and I mentioned to him that I thought that he was part of the solution, that he and I had to work together with the teachers to try to motivate the teachers and motivate the students to raise the scores." (Document No. 12, Exhibit B, at 116). Ibarra subsequently elaborated: "... I said that I wanted a win-win situation, that I'm always looking for win-win and we need to work with the teachers, and that the teachers have a right, especially, you know, a union steward sending memos to her people in the union." *Id.* at 117.

state court proceedings to shift the focus of his statement to issues that the union supports, like school safety and test scores, which are legitimately of general public interest, there is no evidence that Ibarra's responsive remarks were based on anything other than his own personal beliefs regarding the specific role that the teachers' union should play in administrative matters. *See Dodds v. Childers,* 933 F.2d 271, 274 (5th Cir.1991) ("Retroactive embellishment cannot transform personal [concerns] into matters of public concerns."). Thus because the undisputed summary judgment evidence indicates that Ibarra's responsive statement about the union was made solely in furtherance of his employment responsibilities in the East District, and not in the role of a citizen on a matter of public concern, the Court concludes that Ibarra's statement to Paige did not address a matter of public concern, in the constitutional sense. *See, e.g., Noyola v. Texas Dept. of Human Resources,* 846 F.2d 1021 (5th Cir.1988) (holding that conversation between welfare case worker and direct supervisor with whom he had daily contact, criticizing customary procedure for handling caseload and suggesting a realignment of his own caseload was equivalent of airing internal grievance).

■ The other incident about which Ibarra complains is his opposition in a cabinet meeting to Paige's suggestion that the district superintendents talk to their principals and "encourage them to do the involuntary movement of teachers in order to improve the climate." (Document No. 12, Exhibit B, at 141). Again, even if Ibarra was expressing his opposition to the involuntary transfer of union members, as distinguished from teachers in general, his disagreement with Paige was nothing more than a localized dispute confined solely to internal administrative policy, specifically, the criteria for involuntarily transferring personnel among schools. This is not a matter of public concern. *See Caine v. Hardy,* 943 F.2d 1406, 1417 (5th Cir.1991)

(remarks concerning the internal management of hospital anesthesiology department reflected intra-office dispute rather than expression of opinion necessary for society to make informed decision).

In sum, Ibarra's privately expressed differences with Paige and Brown over the role that Ibarra believed the teachers' union should play in the East District, is just that, a private disagreement between an employee and his supervisors concerning internal policy matters. (Document No. 12, Exhibit C, at 6–7) (indicating that conversations about union occurred "in private times when I would go to Dr. Brown's office and the few times that I visited with Dr. Paige"); *see also Thompson,* 901 F.2d at 466–67 (publicity of speech is factor to be weighed in analyzing whether alleged speech addresses matters of public concern); *Dodds,* 933 F.2d at 274 (finding it significant that employee did not address her complaints to anyone outside the College and that complaints did not occur against a background of ongoing public debate about the administration of the College or the operation of the Cosmetology Program).

■ Assuming, however, that Ibarra's defense of the teacher's union in private conversations with Paige and Brown constituted a matter of public concern, there is no evidence that Ibarra's stance on the union issue was a cause of Paige's refusal to recommend the renewal of his employment contract.[7] Indeed, Paige states that he had no knowledge of Ibarra's self-described "working relationship" with the teachers' union or its representatives during his tenure of employment. (Document No. 12, Exhibit C, at 146).

The absence of such a causal connection is also demonstrated in Paige's affidavit which states that Ibarra's contract was not renewed due to "shortcomings in his performance," including "not following District policy as well as not implementing

---

7. Ibarra focuses solely on his conduct relative to the overcrowding situation at Austin High School in his Response and does not discuss

any connection between his "union-friendly" attitude and the nonrenewal of his contract.

specific directives from my office." (Document No. 11, Exhibit B). There is no indication that the shortcomings in performance later identified in the summary judgment evidence related in any way to Ibarra's position on the union. *See Robinson v. Boyer,* 825 F.2d 64, 68 (5th Cir.1987) (finding that record supported district court's conclusion that repeated refusal to comply with order and recommendations of supervisor because of philosophical difference over role of campus security force, as opposed to public criticism of administration's position on issue, was motivating factor in employee's termination).

Therefore, having failed to raise a genuine issue of material fact on either the public concern or causation prongs of his First Amendment claim, Ibarra's Section 1983 claim based on such statements necessarily fails. Defendants are entitled on the merits to summary judgment on this claim.

### 3. *First Amendment Freedom of Association Claim*

Ibarra alleges that he was terminated for maintaining social relationships with the following elected, public officials: Senator Mario Gallegos; Representative Diane Davila; Constable Victor Trevino; Art Contreras; and Richard Farias in violation of his freedom of association rights. (Document No. 1, Original Complaint, at 5–6 & 8). In particular, Ibarra takes issue with Paige's request that Ibarra avoid meeting with Gallegos, Davila, or Trevino, on school-related issues without first consulting HISD's legislative representative Larry Yawn, and Miles Bradshaw, Assistant Counsel to HISD. (Document No. 12, Exhibit B, at 127; Exhibit C, at 63–66).

■ The First Amendment does not contain a "generalized right of 'social association.'" *Wallace,* 80 F.3d at 1051 (quoting *City of Dallas v. Stanglin,* 490 U.S. 19, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989)). The United States Supreme Court has determined that the First Amendment encompasses two categories of association: (1) the choice to enter into and maintain certain intimate human relationships, and (2) the right to associate for the purpose of engaging in expressive activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion. *Wallace,* 80 F.3d at 1051.

■ Ibarra's social relationships with the aforementioned public officials do not fall within the first category as they do not rise to the requisite level of intimacy. *See Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 107 S.Ct. 1940, 1945–46, 95 L.Ed.2d 474 (1987) (listing cases that fall within this category as those related to marriage, the bearing of children, child rearing and education, and cohabitation with familial relatives). Nor do Plaintiff's claims fall within the second category as they do not involve the infringement of any right to association for political purposes. Finally, the limitations placed on Ibarra, specifically to avoid discussing HISD related issues with these individuals outside the presence of the designated HISD legislative representative, is supported by the school district's interest in consistent and efficient administration and in central coordination of its lobbying efforts.[8] *Wallace,* 80 F.3d at 1051–52 (concluding that instructing coaches to maintain professional distance from their players did not violate coach's associational rights and was supported by school's interest in promoting efficient coaching of basketball team). Defendants are entitled to summary judgment on this claim.

### C. *Civil Conspiracy*

■ Ibarra alleges that Defendants civilly conspired to violate his constitution-

---

**8.** Additionally, Paige and Brown would be entitled to qualified immunity because a right to social associations of this nature was not clearly established. Similarly, in light of Ibarra's high-level position, and close working relationship with Paige and Brown, neither Paige nor Brown should reasonably have known that their request for Ibarra to limit his political interaction with these persons on HISD related issues, was a violation of a clearly established right to association.

al rights. As a matter of law, however, a school district cannot conspire with its employees. *See Hilliard v. Ferguson*, 30 F.3d 649, 652–53 (5th Cir.1994) (holding that a school board and its employees constitute a single legal entity which is incapable of conspiring with itself for the purposes of 42 U.S.C. § 1985(3)). Accordingly, Defendants are entitled to summary judgment on this claim.

## D. *Texas Constitution*

Ibarra alleges that the nonrenewal of his employment contract also violated his rights under Article 1, Sections 3, 8, and 19 of the Texas Constitution.

### 1. *Equal Protection*

Plaintiff states in his Complaint that Defendants violated his right to Equal Protection as guaranteed by Article 1, Section 3 of the Texas Constitution when they replaced him with a member of the opposite sex. Assuming that Plaintiff can establish a prima facie claim of sex discrimination under Section 3, Plaintiff has failed to come forward with any evidence to create the inference that his employment contract was not renewed because of his sex. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993) (to demonstrate pretext, plaintiff must show both that employer's proffered reason was false and that discrimination was the real reason).[9] Indeed, Plaintiff does not even address this claim in his Response. (Document No. 12, Response). Defendants are entitled to summary judgment on this claim.

### 2. *Freedom of Expression*

The free speech provision of the Texas Constitution prohibits the passage of any law which curtails free speech and guarantees that "every person" has the right to speak, write, or publish their opinion.[10] Although the Texas courts have recognized that the Texas free speech clause differs textually from its federal counterpart, *Jones v. Memorial Hosp. Sys.*, 746 S.W.2d 891, 893–94 (Tex.App.—Houston [1st Dist.] 1988, no writ); *Alcorn v. Vaksman*, 877 S.W.2d 390, 401–02 (Tex.App.—Houston [1st Dist.] 1994, writ denied), Plaintiff has not cited any authority that has interpreted the Texas free speech clause to provide greater protection to a public employee, like Ibarra, under similar facts and circumstances. Accordingly, for the same reasons that the Court granted Defendants' summary judgment motion on Plaintiff's federal free speech claims, Defendants are also entitled to summary judgment on the same claims based on the Texas Constitution.

### 3. *Due Course of Law*[11]

■ Article 1, Section 19 of the Texas Constitution provides that "[n]o citizen of the State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." Ibarra alleges that the nonrenewal of his contract violated this provision because he was not provided notice and a hearing.

The Texas Supreme Court has stated that "[t]he Texas due course clause is nearly identical to the federal due process clause" and concluded that "[w]hile the Texas Constitution is textually different in

---

**9.** Equal protection challenges under the Texas Constitution are analyzed in the same manner as equal protection claims under the Federal Constitution. *Reid v. Rolling Fork Public Util. Dist.*, 979 F.2d 1084, 1089 (5th Cir.1992); *Hogan v. Hallman*, 889 S.W.2d 332, 338 (Tex. App.—Houston [14th Dist.] 1994, writ denied).

**10.** To the extent that Plaintiff seeks monetary damages, the Texas Supreme Court has held

that there is no implied right of action for damages under the free speech and free assembly provisions of the Texas Constitution. *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 149 (Tex.1995).

**11.** Article 1, Section 19 will not support a private cause of action for nonequitable, monetary damages. *See University of Tex. System v. Courtney*, 946 S.W.2d 464 (Tex.App.—Fort Worth 1997, writ denied).

that it refers to 'due course' rather than 'due process,' [the Court] regard[s] these terms as without meaningful distinction." *University of Tex. Med. Sch. at Houston v. Than*, 901 S.W.2d 926, 929 (Tex.1995); *see also Price v. City of Junction, Tex.*, 711 F.2d 582, 590 (5th Cir.1983) ("It is clear that the protection afforded under the procedural due process rights granted by article I, section 19, are congruent with those in the Federal Constitution."). Therefore, because Ibarra's state due process claims are identical to his federal due process claims, the same analysis and conclusion applies.

## V. *Order*

For the foregoing reasons, it is

ORDERED that Defendants Houston Independent School District's, Dr. Roderick Paige's, and Dr. Johnny Brown's Motion for Summary Judgment (Document No. 11) is GRANTED.

The Clerk shall notify all parties and provide them with a true copy of this Order.