## **APPENDIX**

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
12/21/2015 3:10:49 PM
CHRISTOPHER A. PRINE
Clerk

A.    Caleb v. Grier, No. H-12-0675 (S.D. Tex. June 13, 2015), Memorandum and Order Granting Motion to Dismiss

B.    Caleb v Grier, 598 F.App'x. 227 (5th Cir. 2015)

C.    Caleb v. Grier, No. H-12-0675 (S.D. Tex. Apr. 29, 2015) (Memorandum and Order Granting Motion for Summary Judgment)

# Tab A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MABLE CALEB, JACKIE ANDERSON, §
DIANN BANKS, HERBERT LENTON, §
and PATRICK COCKERHAM, §
§
    Plaintiffs, §
§
v. §     CIVIL ACTION NO. H-12-0675
§
DR. TERRY GRIER, ELIZABETH MATA §
KROGER, DAVID FRIZELL, ESTEBAN §
MAJLAT, and HOUSTON INDEPENDENT §
SCHOOL DISTRICT, §
§
    Defendants. §

MEMORANDUM AND ORDER

Pending are Defendants David Frizell and Esteban Majlat's Second Motion to Dismiss Pursuant to Rule 12(b)(6) (Document No. 59), Defendant Elizabeth Mata Kroger's Third Motion to Dismiss Pursuant to Rule 12(b)(6) (Document No. 60), and Defendants Houston Independent School District and Terry Grier's Second Motion to Dismiss Pursuant to Rule 12(b)(6) (Document No. 64).[1] After having

---

[1] Plaintiffs' Motion for Extension of Time to File Response to Defendants' Motion to Dismiss (Document No. 75) is denied as moot, inasmuch as Plaintiffs have since filed further responses, which have all been considered. Plaintiffs recently filed an Opposed Motion for Leave to File Supplement to Their Third Amended Complaint (Document No. 92). In light of Plaintiffs' prior filings of complaints--the *Third Amended* Complaint is now under review--and with no consequential transactions, occurrences, or events having occurred after Plaintiffs filed their current pleading of more than 100 pages in length, the Motion to File Supplement (Document No. 92) is DENIED. *See* FED. R. CIV. P. 15(d).

Plaintiffs' Motion for Leave to File Designation of Expert Witness (Document No. 83), which is opposed by Defendants HISD,

15-20297.1963

carefully considered the motions, responses, replies, sur-reply, and applicable law, the Court concludes as follows.

## I.  Background

Plaintiff Mable Caleb ("Caleb") was formerly the principal of Key Middle School ("Key"), and Plaintiffs Jackie Anderson ("Anderson"), Diann Banks ("Banks"), Herbert Lenton ("Lenton"), and Patrick Cockerham ("Cockerham") had all worked at Key in various capacities.[2] Plaintiffs' prolix Third Amended Original Complaint-- 111 pages in length--describes in minute detail all sorts of events and interactions that Plaintiffs allege give rise to this action. In essence, Plaintiffs allege that the Superintendent of the Houston Independent School District ("HISD"), Defendant Terry Grier ("Grier"), targeted Caleb for dismissal because of things she said and people with whom she associated, and that he instituted a harassing investigation into her activities at Key and her transition when she was appointed principal at Kashmere High School ("Kashmere").  Plaintiffs Anderson, Banks, and Cockerham, who did not lose their jobs, and Lenton, who did, allegedly were targeted because they worked closely with Caleb.  The complaint alleges that Grier retained Defendant Elizabeth Mata Kroger ("Kroger") and her

---

Grier, and Kroger, is DENIED as having not been timely filed before the deadline for identifying expert witnesses expired.

[2] Document No. 48-1 at 4 (3d Am. Cmplt.).

15-20297.1964

law firm to conduct an investigation regarding the improper transfer of HISD property from Key to Kashmere, cheating on standardized tests, and other alleged improprieties at Key. Kroger, in turn, hired David Frizell ("Frizell") and Esteban Majlat ("Majlat") to assist in the investigation.[3] During their investigation Kroger, Frizell, and Majlat interviewed Anderson, Banks, Lenton, and Cockerham on more than one occasion, and allegedly treated them rudely, made accusations that they were lying, were protecting Caleb, and were otherwise guilty of being involved in the alleged improprieties.

Plaintiffs allege that their First Amendment rights to free speech and free association were violated, and Plaintiff Caleb alleges a deprivation of her constitutionally-protected liberty interests in the form of a procedural due process name-clearing hearing. Finally, Caleb accuses Defendant Grier of denying her equal protection under the law. All Defendants have moved to dismiss the claims under 12(b)(6).

## II.   Legal Standard

### A.   Rule 12(b)(6) Standard

Rule 12(b)(6) provides for dismissal of an action for "failure to state a claim upon which relief can be granted." FED. R. CIV.

---

[3] Id. at 5-6.

15-20297.1965

P. 12(b)(6).  When a district court reviews the sufficiency of a complaint before it receives any evidence either by affidavit or admission, its task is inevitably a limited one.  *See* Scheuer v. Rhodes, 94 S. Ct. 1683, 1686 (1974), *abrogated on other grounds by* Harlow v. Fitzgerald, 102 S. Ct. 2727 (1982).  The issue is not whether the plaintiff ultimately will prevail, but whether the plaintiff is entitled to offer evidence to support the claims.  Id.

In considering a motion to dismiss under Rule 12(b)(6), the district court must construe the allegations in the complaint favorably to the pleader and must accept as true all well-pleaded facts in the complaint.  *See* Lowrey v. Tex. A&M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997).  To survive dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  While a complaint "does not need detailed factual allegations . . . [the] allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 127 S. Ct. at 1964-65 (citations and internal footnote omitted).

15-20297.1966

B.   <u>42 U.S.C. § 1983</u>

Plaintiffs seek compensatory and punitive damages for alleged violations of their constitutional rights.   Although their complaint does not cite 42 U.S.C. § 1983, Section 1983 is the statute that provides a private cause of action for redressing a violation of federal law or "vindicating federal rights elsewhere conferred."   <u>Albright v. Oliver</u>, 114 S. Ct. 807, 811 (1994) (quoting <u>Baker v. McCollan</u>, 99 S. Ct. 2689, 2694 n. 3 (1979)).   To state a viable claim under § 1983, "a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law."   <u>Leffall v. Dallas Indep. Sch. Dist.,</u> 28 F.3d 521, 525 (5th Cir. 1994).   A § 1983 plaintiff must support his claims with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations.   <u>Schultea v. Wood</u>, 47 F.3d 1427, 1433 (5th Cir. 1995).

III.   <u>HISD's and Terry Grier's Motion to Dismiss</u>

A.   <u>First Amendment Free Speech Claims</u>

To recover on a First Amendment retaliation claim, a plaintiff must show that: (1) she suffered an adverse employment action; (2) her speech involved a matter of public concern; (3) her

15-20297.1967

interest in commenting on matters of public concern outweighs the public employer's interest in efficiency; and (4) the speech motivated the adverse employment action. DePree v. Saunders, 588 F.3d 282, 286-87 (5th Cir. 2009), *cert. dismissed*, 130 S. Ct. 3450 (2010). In other words, "[t]o prevail, [plaintiff] must show that she engaged in protected conduct and that it was a motivating factor in her discharge." Beattie v. Madison Cty. Sch. Dist., 254 F.3d 595, 601 (5th Cir. 2001).

"[B]efore asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a citizen' or as part of her public job." Davis v. McKinney, 518 F.3d 304, 312 (5th Cir. 2008) (quoting Mills v. City of Evansville, 452 F.3d 646, 647 (7th Cir. 2006)); *see also* Garcetti v. Ceballos, 126 S. Ct. 1951, 1960 (2006) ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). The focus of this inquiry is not on the content of the speech, but on "the role the speaker occupied when [she] said it." Davis, 518 F.3d at 312 (quoting Williams v. Dallas Indep. Sch. Dist., 480 F.3d 689, 692 (5th Cir. 2007)). The distinction is between "speech that is 'the kind of activity engaged in by citizens who do not work for the government,' . . . and activities undertaken in the course of

6

15-20297.1968

performing one's job." Williams, 480 F.3d at 693 (quoting Garcetti, 126 S. Ct. at 1962). "Even if the speech is of great social importance, it is not protected by the First Amendment so long as it was made pursuant to the worker's official duties." Id. at 692 (citing Garcetti, 126 S. Ct. at 1960). Moreover, even if speech is "not necessarily required" by an employee's job duties, it is not protected if it is sufficiently related to them. Charles v. Grief, 522 F.3d 508, 513 (5th Cir. 2008) (discussing Williams, 480 F.3d at 693). A number of factors guide a court in determining whether an employee is speaking pursuant to her official duties: the relationship between the topic of the speech and the employee's job; whether the employee spoke internally up the chain of command at her workplace; and whether the speech resulted from special knowledge gained as an employee. *See* Davis, 518 F.3d at 312-14; *see also* Gentilello v. Rege, No. 3:07-CV-1564-L, 2008 WL 2627685, at *3 (N.D. Tex. June 30, 2008). Whether an employee is speaking as a citizen or pursuant to her employment is a question of law for the Court to resolve, even though it "involves the consideration of factual circumstances surrounding the speech at issue." Charles, 522 F.3d at 513 n.17.

### 1. Caleb

Caleb alleges that her First Amendment rights were violated because she made protected speech and suffered an adverse

15-20297.1969

employment action because of that speech.[4]  Caleb asserts that she made the following protected speech:

- In 2005, Caleb's speech refusing to agree with accusations made against Key Math Department Chairman, Richard Adebayo, regarding cheating on standardized testing.[5]

- In 2007, Caleb's speech when she agreed with students' and staff's claims that there was toxic mold at Key when questioned by the media;[6] and again, when she spoke to federal agencies dealing with public health at Key.[7]

- On November 12, 2009, Caleb's speech at a town hall meeting at New Mt. Calvary Baptist Church that was held to discuss the appointment of a new principal to replace Caleb at Key Middle School when she moved to Kashmere High School.[8]

- On November 13, 2009, Caleb's speech in a non-public meeting between her and Grier, when she admonished Grier

---

[4] Document No. 48-1 at 92, 99.

[5] Id. at 92-93.

[6] Id. at 8-9, 92-93.

[7] Id. at 92.

[8] Id. at 92-93.

15-20297.1970

for making a remark to her during their conversation that she believed was "racially dismissive."[9]

- On or about March 22, 2010, Caleb's speech to <u>The Houston Chronicle</u> about her intention to retire from HISD effective August 2010, and denying "Grier's and Mata Kroger's substantially false accusations against her."

Caleb alleges no facts to show that her 2005 speech--five years before her separation from HISD--was protected speech.  From what she does plead, the plain inference is that her speech addressed an issue on which she was speaking as the principal of Key, regarding an issue on which she had special knowledge based on her position at Key, and on which there was a direct relationship between the topic of speech and the performance of her job.  Moreover, the gap of time between this 2005 speech and the alleged retaliation in 2010--a period within which Caleb was promoted from middle school principal to being a high school principal--makes wholly implausible any inference of free speech retaliation.  Caleb has pled no facts regarding this alleged speech to state a claim for relief above a speculative level.

Almost as remote in time from when she separated from HISD was Caleb's speech on toxic mold, in which she alleges that she answered questions from the media and spoke to federal agencies about this condition at Key.  The alleged speech was not made

---

[9] <u>Id.</u> at 95.

15-20297.1971

internally within HISD, which is an important factor to consider in determining whether Caleb was speaking as part of her public job. It was also speech regarding a matter of public concern, namely, toxic mold at a public school.  But this speech was also made years before the alleged retaliation in 2010, and Plaintiffs allege no direct evidence or any "plausible chronology" that permits a reasonable inference of free speech retaliation.  *Compare* <u>Brady v. Houston Indep. Sch. Dist.</u>, 113 F.3d 1419 (5th Cir. 1997).  Other facts pled by Plaintiffs lead to the inevitable inference that Caleb's 2007 speech was *not* a cause of her 2010 separation. Plaintiffs' complaint alleges that Caleb was *correct* in her assessment of the presence of toxic mold, that HISD thereafter ordered the reconditioning of Key, and that HISD then reopened Key "under Caleb's leadership" in the 2008-09 school year.  Caleb's 2007 speech was made long before Grier became HISD Superintendent, Caleb was vindicated in what she said, and--according to Plaintiffs' pleading--she was rewarded with Key being reopened "under Caleb's leadership."  To allege that Grier and HISD retaliated against Caleb in April 2010 for this remote speech given in 2007 is entirely conclusory and insufficient to state a claim upon which relief can be granted.

On November 12, 2009, when Caleb at the invitation of a state representative attended a town hall meeting that was convened to discuss with HISD Superintendent Grier whether he would appoint

15-20297.1972

Bernett Harris to succeed Caleb as principal at Key, the complaint alleges that Superintendent Grier called Caleb about 5 p.m. to ask if she would be present at the meeting and, if so, to apologize for Superintendent Grier's absence.  The complaint alleges that Caleb did relay the Superintendent's message and applauded the audience for attending the meeting and showing parental support for their children's education.  No allegation is made of Caleb making any controversial statement or any statement with which Grier disagreed, the plain inference being that Caleb's speech at the meeting was made in her role as an HISD principal, and at the instance of the Superintendent.  Caleb has alleged no facts to support her claim that she was speaking as a citizen and not as part of her public employment.

Caleb's speech the next day, on November 13, was in a non-public internal meeting between her and her supervisor, Superintendent Grier.  Her comments were not made public.  Grier was relating his views on the appointment of a new principal for Key, told Caleb that he had promised to attend a community meeting the next day at a church, and "abruptly asked Caleb, who had spoken for him the previous night, 'How do you speak to those people?'" Caleb thought the question carried an overtone of racial bigotry, and admonished him.  Caleb's comments to Grier, made in this private meeting between the HISD superintendent and an HISD principal concerning school administration issues and community

11

15-20297.1973

communications, does not constitute protected speech under the First Amendment.

Lastly, Caleb's speech to The Houston Chronicle in March, 2010 rebutting misconduct allegations made against her does not plainly constitute speech in her role as an HISD administrator.  Because Caleb has stated facts regarding an adverse employment action she suffered within temporal proximity the following month,[10] and because she has alleged some facts in support of her claim that the protected speech motivated the adverse employment action,[11] Caleb has stated a claim for violation of her First Amendment right to free speech based on this incident.

### 2.   Anderson, Banks, Lenton, and Cockerham

Anderson, Banks, Lenton, and Cockerham also allege that their First Amendment rights to free speech were violated because they remained silent and/or refused to be dishonest when questioned about Caleb.[12]  The complaint contains detailed descriptions of the

---

[10] The nature of Caleb's departure from HISD is not completely clear, but the pleading alleges that Grier recommended to the Board of Trustees that she should be terminated without cause, and informed Caleb that her last day at HISD would be April 28, 2010. Document No. 48-1 at 31.

[11] Caleb also alleges that when Grier learned of Caleb's speech to The Houston Chronicle denying the allegations of impropriety, he made a comment regarding whether he would let her resign or fire her sooner.  Id. at 25.

[12] Id. at 99.

15-20297.1974

experiences of Anderson, Banks, Lenton, and Cockerham in answering questions from Defendants Kroger, Frizell, Majlat,[13] and others regarding their knowledge of and/or involvement in various alleged improprieties at Key that were under investigation.  The complaint alleges that the investigators engaged in rude and abrasive treatment of Plaintiffs when asking their questions, expressed disbelief at the answers, and ridiculed Plaintiffs' answers.  The complaint does not allege, however, that Anderson, Banks, Lenton, and Cockerham made any protected speech or that they were deprived of a constitutionally protected right to refrain from speaking.  In all of the interviews, Anderson, Banks, Lenton, and Cockerham were allegedly speaking, and at times making denials of accusations, about their own job performances and their knowledge of Caleb's activities at Key Middle School.  They were speaking as HISD employees to HISD retained investigators in connection with an official HISD investigation.  All of their speech was therefore made pursuant to their official duties.  There are no facts alleged to support a claim that they were speaking as private citizens in any of these meetings.[14]   Anderson's, Banks's, Lenton's, and

---

[13] Whether Kroger, Frizell, and Majlat should be regarded as state actors--at this pleading stage--is considered below at pages 21 through 24.

[14] Plaintiffs rely on the Second Circuit's holding in Jackler v. Byrne, 658 F.3d 225 (2d Cir. 2011), in support of their free speech claim.  Document No. 72 at 4.  Soon after the Jackler decision, the District of Columbia Circuit--in denying rehearing in Bowie v. Maddox, 653 F.3d 45, 48 (D.C. Cir. 2011), *cert. denied*,

13

15-20297.1975

Cockerham's claims that their First Amendment rights to free speech were violated are therefore dismissed.

B.    First Amendment Free Association Claims

Caleb claims that her First Amendment free association rights were also violated when she engaged in protected association by accepting State Representative Harold Dutton's invitation to attend the town hall meeting at New Mt. Calvary Baptist Church on November 12, 2009, and then spoke with Dutton after the meeting.[15]  Caleb also asserts that she exercised protected association in her political support of Dutton and HISD Board member Carol Mims Galloway, an alleged opponent of Grier,[16] but pleads no facts beyond her conclusory allegations that her political support of Dutton and Galloway resulted in any adverse action against her by HISD.  In support of her claim that Defendants violated her right to free association, Caleb asserts that Defendants had views that Caleb had "friends in high places," that she knew everything that went on at

---

132 S. Ct. 1636 (2012)--persuasively rejected the rationale of Jackler pointing out that under Garcetti v. Ceballos, 126 S. Ct. 1951 (2006), it is "only when public employees 'make public statements outside the course of performing their official duties' do they 'retain some possibility of First Amendment protection.'" Id. at 47 (*quoting* Garcetti, 126 S. Ct. at 1961).  The D.C. Circuit summarized, "The Second Circuit gets Garcetti backwards."  Id. at 48.   The Fifth Circuit appears not to have written on this point but this Court believes it would follow Garcetti and Bowie.

[15] Document No. 48-1 at 93.

[16] Id.

14

15-20297.1976

HISD, and that she had a "clique" at Key Middle School.[17] Plaintiffs Anderson, Lenton, and Cockerham, who were requested by Caleb to move with her from Key to Kashmere, also claim that they "exercised protected association with Caleb, in that they constituted members of what Majlat characterized to Anderson as Caleb's 'clique'."[18]

To establish a violation of one's First Amendment right to freedom of association, a plaintiff must show that (1) she suffered an adverse employment action, (2) her interest in "associating" outweighed the public employer's interest in efficiency, and (3) her protected activity was a substantial or motivating factor in the adverse employment action. Hitt v. Connell, 301 F.3d 240, 246 (5th Cir. 2002). "The Constitution does not include a 'generalized right of 'social association.'" Wallace v. Tex. Tech. Univ., 80 F.3d 1042, 1051 (5th Cir. 1996) (quoting City of Dallas v. Stanglin, 109 S. Ct. 1591, 1595 (1989)). The United States Supreme Court has determined that the First Amendment encompasses two categories of association: (1) the choice to enter into and maintain certain intimate human relationships, and (2) the right to associate for the purpose of engaging in expressive activities protected by the First Amendment—namely, speech, assembly,

---

[17] Id. at 94.

[18] Id. at 99. Plaintiff Banks alleges no violation of protected association.

15

15-20297.1977

petition for the redress of grievances, and the exercise of religion. *See* id.*; see also* Ibarra v. Houston Indep. Sch. Dist., 84 F. Supp. 2d 825, 837 (S.D. Tex. 1999) (same). Intimate relationships include marriage, the bearing of children, child rearing and education, and cohabitation with familial relatives. Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 107 S. Ct. 1940, 1945-46 (1987). "Relationships with colleagues ordinarily are not afforded protection as intimate associations." Hernandez v. Duncanville Sch. Dist., No. 3:04 CV 2028 BH(B), 2005 WL 3293995, at *10 (N.D. Tex. Dec. 5, 2005) (citing Swanson v. City of Bruce, Miss., 105 F. App'x 540, 542 (5th Cir. 2004)).

None of Plaintiffs has alleged any facts to support a claim that any intimate personal relationship caused their adverse employment actions. The complaint alleges only professional relationships between Caleb, Anderson, Banks, Lenton, and Cockerham, and the same is true as regards Caleb's relationships with State Representatives Dutton and HISD Trustee Galloway. None of Plaintiffs has stated a claim for a violation of the constitutional right to free association under the first category.

Furthermore, none of Plaintiff Caleb's alleged associations was for the purpose of carrying on a protected activity.[19] Representative Dutton invited Caleb, the outgoing principal at Key,

---

[19] None of the other Plaintiffs makes any allegations regarding the second category.

16

15-20297.1978

to attend a community/town hall meeting called to discuss the appointment of Caleb's successor at Key.  At the request of Superintendent Grier himself, Caleb spoke--as an HISD principal and Grier's spokesperson, to apologize for Grier's absence and went on to laud the attending citizens for their involvement in educational issues affecting the community's children.  Caleb's participation in the meeting, therefore, was not for the purpose of her engaging in constitutionally protected activity.  She was invited as a school principal and educational leader in the community and, when she attended, she delivered a message in behalf of and at the request of the Superintendent himself and added her own praise for the citizens' participation, as school superintendents and principals regularly do.  Plaintiff Caleb's pleading of these facts alone belies any conclusory claim that she was targeted for an adverse employment action because of her attendance at the community/town hall meeting or for visiting with one of its sponsors, Representative Dutton.  Caleb, Anderson, Banks, Lenton, and Cockerham have failed to allege facts sufficient to state a claim for a Constitutional violation of their rights to free association.

C.    Liberty-Interest Due Process Claims

Plaintiff Caleb asserts a deprivation of her liberty interests, a type of procedural due process claim under the

17

15-20297.1979

Fourteenth Amendment. "[D]ischarge from public employment under circumstances that put the employee's reputation, honor or integrity at stake gives rise to a liberty interest under the Fourteenth Amendment to a procedural opportunity to clear one's name." Rosenstein v. City of Dallas, Tex., 876 F.2d 392, 395 (5th Cir. 1989).[20] See also Hughes v. City of Garland, 204 F.3d 223, 225 (5th Cir. 2000). The Fifth Circuit has stated:

> [P]ublic officials do not act improperly in publicly disclosing charges against discharged employees, but they must thereafter afford procedural due process to the person charged. Moreover, the process due such an individual is merely a hearing providing a public forum or opportunity to clear one's name, not actual review of the decision to discharge the employee.

Rosenstein, 876 F.2d at 395. To prevail on a claim that a plaintiff's liberty interests were violated, the plaintiff must show: (1) that she was discharged; (2) that stigmatizing charges were made against her in connection with the discharge; (3) that the charges were false; (4) that she was not provided notice or an opportunity to be heard prior to her discharge; (5) that the charges were made public; (6) that she requested a hearing to clear

---

[20] A rehearing was granted by 884 F.2d 174 (5th Cir. 1989), and the panel opinion was reinstated in part by 901 F.2d 61 (5th Cir. 1990). Certiorari was denied by 111 S. Ct. 153 (1990).

15-20297.1980

her name; and (7) that the employer refused her request for a hearing.  Hughes, 204 F.3d at 226.[21]

The complaint is not a model of clarity as to whether Plaintiff Caleb requested and was denied a name-clearing hearing such as to support a liberty interest claim.  It is alleged that Caleb was told, "the effective date of your separation from HISD will [sic] April 28, 2010."  Caleb alleges she was not afforded due process before her demotion or discharge, and was "denied without due process of law . . . the opportunity to confront the charges and have a meaningful hearing to clear her name . . . ."  Given that the allegations are construed favorably to Plaintiff on a Rule 12(b)(6) motion, and because a fact intensive issue such as this is better determined with an evidentiary record, the motion to dismiss this claim as to Caleb will be denied.

---

[21] The complaint alleges that "[W]hile Anderson, Cockerham, and Banks each had a due process hearing and were not terminated with the Texas Education Agency Independent Hearing Examiner's finding in each case the charges were unfounded by preponderance of the evidence, all (except Lenton) were vindicated . . . ."  The three vindicated Plaintiffs allege no violation of their procedural due process rights.  The plain implication of the allegation that "all (except Lenton) were vindicated," is that Lenton also had a due process, name-clearing hearing.  Indeed, Lenton separately alleges no liberty-interest due process claim.

15-20297.1981

D.    Equal Protection Claim

Caleb alleges that Defendant Grier denied her equal protection of the law.[22] "To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class."  Williams v. Bramer, 180 F.3d 699, 705 (5th Cir. 1999).[23]  Caleb, a black woman, alleges that "Grier has denied her equal protection of the law in that he has treated her adversely while not treating adversely white Principals in whose schools occurred TAKS irregularities or cheating, and/or student record alterations, and/or permitting faculty to cause minors to serve alcoholic beverages for student credit, and/or alteration of student dropout documents, and/or other violations of law and policies."[24]   Later in the complaint Caleb claims that she was denied the same protections afforded to "white Principals or Associate Principals Crum, Mosteit, Wichmann, and Dambrino."[25] Apart from stating their race, Caleb alleges no facts regarding any of these individuals, their conduct as principals or associate

---

[22] Id. at 98-99.

[23] The class-of-one theory of equal protection does not apply in the public employment context. Engquist v. Ore. Dep't of Agr., 128 S. Ct. 2146, 2155-57 (2008).

[24] Document No. 48-1 at 98.

[25] Id. at 111.

20

15-20297.1982

principals, how they were similarly situated to her, or how any of the comparators was treated, or any other facts that would plausibly state a claim for a violation of her equal protection rights. Allegations must "raise a right to relief above the speculative level." Twombly, 127 S. Ct. at 1965. This claim is likewise dismissed.[26]

### IV. Kroger's, Frizell's, and Majlat's Motions to Dismiss

Plaintiffs assert First Amendment retaliation claims and a Fourteenth Amendment due process claim against Defendants Kroger, Frizell, and Majlat. Kroger, Frizell, and Majlat move to dismiss the claims against them because they are not state actors and Plaintiffs have not alleged facts to support a conspiracy that might render them liable despite not being state actors. They further move for dismissal on the grounds that, even if they were state actors, Plaintiffs have not stated a claim against them for violations of Plaintiffs' constitutional rights.

To state a viable claim under § 1983, "a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state

---

[26] Caleb is the only Plaintiff who asserts an equal protection claim. Although the claim is only made against Defendant Grier, to the extent that it may be construed to be alleged also against HISD, it is also dismissed.

21

15-20297.1983

law."   Leffall v. Dallas Indep. Sch. Dist., 28 F.3d 521, 525 (5th Cir. 1994).   "[T]he party charged with the deprivation [of a federal right] must be a person who may fairly be said to be a state actor.   This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State."   Lugar v. Edmondson Oil Co., Inc., 102 S. Ct. 2744, 2754 (1982).   Determining whether a party's conduct constitutes state action is a "necessarily fact-bound inquiry."   Id. at 2755; Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 121 S. Ct. 924, 932 (2001).   The fact that an individual is not a full-time public employee with the state entity does not preclude that person from being considered to be acting under color of law.   See West v. Atkins, 108 S. Ct. 2250, 2259 (1988) ("The fact that the State employed respondent pursuant to a contractual arrangement that did not generate the same benefits or obligations applicable to other 'state employees' does not alter the analysis.   It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State.").

The complaint alleges that Kroger, Frizell, and Majlat were working for HISD to conduct an investigation into the alleged improprieties at Key.   The complaint alleges that investigations were generally conducted by HISD's Department of Professional

22

15-20297.1984

Standards,[27] implying that Kroger, Frizell, and Majlat were performing duties normally carried out by HISD staff. Plaintiffs' claims all arise out of Kroger's, Frizell's, and Majlat's conduct in performing the investigation, and in Kroger's role in allegedly leaking the report for publication. At the pleading stage, therefore, Plaintiffs have stated sufficient facts to support the assertion that Kroger, Frizell, and Majlat were acting under color of law during the course of their investigation.

Defendants Kroger, Frizell, and Majlat also move for dismissal on the basis that Plaintiffs fail to allege facts to support a claim that these Defendants violated Plaintiffs' Constitutional rights. "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 129 S. Ct. at 1948.

For the reasons explained at length above as to why Plaintiffs' claims against HISD and Grier are deficient, those same claims are likewise insufficient to state a plausible right to relief against Kroger, Frizell, and Majlat. Moreover, as to all claims alleged against Kroger, Frizell, and Majlat, Plaintiffs fail to allege that these Defendants had any authority to make decisions regarding any of Plaintiffs' employments and allege nothing but conclusory allegations that Kroger, Frizell, and Majlat had any

---

[27] Document No. 48-1 at 6.

23

15-20297.1985

role in making those decisions.  The complaint alleges that Kroger, Frizell, and Majlat conducted their investigations in a manner that was abrasive, insulting, and demeaning to Plaintiffs.  The complaint further alleges that Kroger was involved in leaking the investigation report to the press.  These do not state constitutional violations of Plaintiffs' rights even if the outside lawyers were regarded as state actors.  The complaint charges Grier with initiating termination proceedings against each of Plaintiffs and complains of some review procedures conducted by HISD as part of HISD's process.  Plaintiffs fail to allege any facts to support an assertion that Kroger, Frizell, or Majlat had any role in deciding whether Plaintiffs should be terminated, or that they were the decision makers in any other *adverse employment action* against any Plaintiff.  Plaintiffs do not allege that Kroger, Frizell, and Majlat owed Plaintiffs any process, or that they had any control over deciding whether to give Plaintiffs a name-clearing hearing. Plaintiffs allege no facts that would raise their right to relief against any of these individuals above the speculative level. Accordingly, Plaintiffs' claims against Defendants Kroger, Frizell, and Majlat are dismissed.

24

15-20297.1986

V.   Order

For the foregoing reasons, it is

ORDERED that Defendants David Frizell and Esteban Majlat's Second Motion to Dismiss Pursuant to Rule 12(b)(6) (Document No. 59) and Defendant Elizabeth Mata Kroger's Third Motion to Dismiss Pursuant to Rule 12(b)(6) (Document No. 60) are both GRANTED, and all claims made by Plaintiffs Mable Caleb, Jackie Anderson, Diann Banks, Herbert Lenton, and Patrick Cockerham against Defendants Frizell, Majlat, and Kroger are DISMISSED WITH PREJUDICE.  It is further

ORDERED that Defendants Houston Independent School District's and Terry Grier's Second Motion to Dismiss Pursuant to Rule 12(b)(6) (Document No. 64) is GRANTED in its entirety as to the claims of Plaintiffs Anderson, Banks, Lenton, and Cockerham, and all claims made by Plaintiffs Anderson, Banks, Lenton, and Cockerham against these Defendants are DISMISSED WITH PREJUDICE; and Defendants HISD's and Terry Grier's Second Motion to Dismiss is GRANTED in part as to Plaintiff Caleb, and otherwise DENIED, and all claims by Plaintiff Caleb against Defendants Houston Independent School District and Terry Grier are DISMISSED WITH PREJUDICE, except only for Plaintiff Caleb's claims that Defendants HISD and Terry Grier retaliated against her for making protected speech to The Houston Chronicle in response to the report published regarding her alleged misconduct, and Plaintiff Caleb's claim that

25

15-20297.1987

26

Defendants HISD and Grier deprived her of her liberty interest by denying her a procedural due process hearing to clear her name.

The Clerk will enter this Order and provide a correct copy to all parties.

SIGNED at Houston, Texas, on this <u>13th</u> day of June, 2013.

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

15-20297.1988

# Tab B

598 Fed.Appx. 227
United States Court of Appeals,
Fifth Circuit.

Mable CALEB; Patrick Cockerham; Diann
Banks; Herbert Lenton, Plaintiffs–Appellants

v.

Doctor Terry GRIER; Houston Independent
School District, also known as HISD;
Elizabeth Mata Kroger; David Frizell;
Esteban Majlat, Defendants–Appellees.

No. 13–20582.    |    Jan. 6, 2015.

**Synopsis**
**Background:** Employees commenced action against
school district, superintendent, lawyer hired for internal
investigation, and private investigators, alleging freedom of
speech, retaliation, freedom of association, and procedural
due process claims. The United States District Court for
the Southern District of Texas, Ewing Werlein, Jr., J., 2013
WL 2902785, dismissed the claims against the lawyer and
investigators, and granted motion in part for certification
and entry of final judgment, 2013 WL 5614310. Employees
appealed.

**Holdings:** The Court of Appeals held that:

[1] lawyer and investigators were not state actors;

[2] speech by teacher's assistant, teacher, and school
custodian was outside ambit of First Amendment protection
on retaliation claim;

[3] teacher's assistant, teacher, and school custodian did not
suggest intimate relationship protected by First Amendment;

[4] mere reference by lawyer that public school principal
whose employment was terminated had relationships with
state representative and school board member did not
plausibly suggest that lawyer, or investigators, took any
action against principal based on that association;

[5] teacher's assistant, teacher, and school custodian did not
state that they had been denied procedural due process; and

[6] lawyer and private investigators did not violate procedural
due process rights of principal.

Affirmed.

**Attorneys and Law Firms**

*228 Laurence Wade Watts, Watts & Associates, Missouri
City, TX, for Plaintiffs–Appellants.

Arturo Garcia Michel, John M. Hopkins, Esq., Kevin Frank
Risley, Thompson & Horton, L.L.P., Houston, TX, Richard
Alan Morris, Adam David Courtin, Rogers, Morris & Grover,
L.L.P., Houston, TX, for Defendants–Appellees.

Appeal from the United States District Court for the Southern
District of Texas. No. 4:12–CV–675.

Before KING, DENNIS, and CLEMENT, Circuit Judges.

**Opinion**

PER CURIAM: *

* Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not
precedent except under the limited circumstances set
forth in 5TH CIR. R. 47.5.4.

Plaintiffs–Appellants appeal the district court's dismissal of
their complaint for failure *229 to state a claim on which
relief can be granted. Appellants sued under 42 U.S.C. § 1983
for violations of their rights to freedom of speech, freedom of
association, and procedural due process. For the reasons that
follow, we AFFIRM.

## I. Factual and Procedural Background [1]

1 Since we are reviewing the district court's judgment
granting a motion under Federal Rule of Civil Procedure
12(b)(6), we accept the allegations in the amended
complaint as true.

This case arises out of the Houston Independent School
District's ("HISD") investigation of Appellants' activities
while employed by HISD. Plaintiff–Appellant Mable Caleb
was formerly the principal of Key Middle School ("Key")
and later of Kashmere High School ("Kashmere"). Key
and Kashmere are both schools within HISD. Plaintiff–

Appellant Diann Banks was a sixth grade math teacher at Key. Plaintiff–Appellant Herbert Lenton was an "operator" at Key, meaning he was responsible for cleaning and maintenance duties. Plaintiff–Appellant Patrick Cockerham was a teacher's assistant at Key, starting at the beginning of the 2008–2009 school year.

In 1993, Caleb was appointed principal of Key, a school serving an "at risk" student population. In 2005, Richard Adebayo, Key's math department chairman/coordinator, was accused of facilitating student cheating on the Texas Assessment of Knowledge and Skills ("TAKS") standardized test. Caleb alleges that she exercised protected speech when she refused to agree with purportedly false accusations that Adebayo was involved with TAKS cheating at Key.

In 2007, students and staff alleged that they were made ill by toxic mold within Key, though HISD apparently denied that there was a mold problem. Caleb voiced agreement with the students' and staff's concerns to the media. Subsequently, the Centers for Disease Control and the Environmental Protection Agency found mold at Key. HISD ordered that Key be reconditioned in order to address the problem. Key was reopened under Caleb's leadership for the 2008–2009 school year.

In January 2009, in order to help teachers prepare their students for the math portion of the 2008–2009 TAKS test, preparation materials were distributed by Key's math department. During the preparation period, Banks was given a handwritten set of math problems and was told that they were being delivered on behalf of the math department and that she needed to type the handwritten material. Rather than type the material, Banks re-wrote the set of math problems in neater handwriting. Later, Soo Jin Lee, another teacher at Key, typed Banks's handwritten version, and then distributed them as a practice set to the rest of Key's math teachers. Appellants allege that those math problems were actual TAKS questions, and that Lee and another teacher had planned to introduce those questions into Key students' preparation materials in order to artificially inflate the students' scores, thus qualifying the teachers for a bonus. Appellants allege that Banks was an unwilling participant in this scheme.

In April 2009, Caleb was notified that she would be transferred to serve as principal at Kashmere for the 2009–2010 school year; she was told to accept the transfer, or she would be forced into early retirement. After accepting, Caleb served as transitional principal of Key, until a new principal was appointed. On Caleb's recommendation, **\*230** Bernett Harris took over as principal of Key.

After Terry Grier was hired, in September 2009, as the new superintendent of HISD, he decided to remove Harris as principal. Members of the community, including the pastor of New Mt. Calvary Baptist Church, Willie Jones, were concerned about Grier's decision, as they believed that Harris was the right person for the principal's job at Key. Reverend Jones asked Grier not to remove Harris until Grier had met with the community's leaders; Grier agreed. However, he allegedly went back on his promise and replaced Harris before any such meeting was held. On November 12, 2009, a town hall meeting was held at New Mt. Calvary Baptist Church to discuss Grier's decision to remove Harris as principal of Key. At 5:00 p.m., Grier called Caleb "to ask if she would be present at the meeting and, if so, to apologize for his absence." Caleb attended the meeting, apologized for Grier's absence, and applauded the audience's "display of personal responsibility and parental involvement [by] attending the meeting and showing concern for their children's education." On November 13, 2009, Reverend Jones and Texas State Representative Harold Dutton picketed the HISD administration building in support of Harris. On November 14, 2009, Grier attended a second meeting at the church, where he was questioned and criticized by the audience.

Appellants allege that shortly thereafter Grier resolved to terminate Caleb. He allegedly decided to lay a basis for Caleb's termination by conducting an investigation into an anonymous allegation that Caleb, Lenton, and others had stolen HISD property from Key when they moved Caleb's belongings from Key to Kashmere on October 31, 2009.

After her transfer to Kashmere, Caleb had asked Cockerham and Lenton to transfer to Kashmere with her. During the summer of 2009, Cockerham was assigned to organize Kashmere's book room. After completing that task, Cockerham was asked to return to Key to document information on computers in the AV room, including a computer assigned to Caleb. Later, Cockerham's involvement with those tasks prompted HISD's investigators to question him about whether school equipment, including the computers, was removed from Key.

On October 31, 2009, Harris and Caleb decided to transfer Caleb's collection of personal items from Key, along with "items needed to start up the new Kashmere administration."

Caleb and Harris also decided to "move and 4 relocate any HISD assets which should be at Kashmere from Key, in accordance with HISD practices." They allegedly scheduled the move with an HISD administrator, Tony Shelvin. Later that day, Harris, Caleb, Lenton, and other Key employees moved Caleb's personal property and HISD property from Key to Kashmere.

Appellants allege that Grier used the movement of HISD property from Key to Kashmere as the basis for hiring Defendant–Appellee Elizabeth Mata Kroger, a partner of the private law firm Martin, Disiere, Jefferson & Wisdom, L.L.P. ("MDJW"). Kroger then hired Defendants–Appellees David Frizell and Esteban Majlat to assist with the investigation. MDJW's involvement began with a preliminary inquiry to determine whether a more thorough investigation was necessary.

On December 4, 2009, Cockerham was instructed by Caleb to help Majlat and others locate and check the serial numbers of computers. On December 7, 2009, Majlat met with Cockerham for two hours. During the meeting, Majlat asked whether **\*231** Cockerham had moved anything for Caleb, or if Caleb had stolen district property or taken district property home with her. Cockerham answered that he did not know. According to the complaint, "[t]he meeting terminated with Cockerham stating that he had never taken any property for Caleb or witnessed her take any property from the school." On December 10, 2009, Cockerham received a letter instructing him to meet with Kroger, Frizell and others. At the meeting, Kroger explained that Cockerham was not the target of the investigation, but he may have relevant information. Cockerham left after he stated that he wouldn't answer any more questions without an attorney present.

On December 11, 2009, MDJW recommended that HISD hire them to conduct an investigation of the "purchase, inventory and use of fixed assets, including technology equipment, intended for Key Middle School, as well as 5 the transfer and removal of such assets to Kashmere High School." The scope of the investigation expanded to include, in addition to the allegations of misappropriation of school property: "overtime work and benefits to relatives of Mabel Caleb ... [and] possible improprieties concerning TAKS testing at Key during [the] 2008–2009 academic school year."

Over the next several months, all of the Appellants were questioned by Kroger, Frizell, and Majlat as part of the internal investigation. On December 17, 2009, Cockerham

met with Kroger, Frizell, Majlat, and others for a second round of questioning. Allegedly, Kroger and Frizell called Cockerham a liar and said that they could not understand why he would protect Caleb. On December 18, 2009, Caleb attended a three hour meeting with Kroger, Frizell and Majlat.

On January 15, 2010, Cockerham was reassigned to the HISD Transportation Department. Cockerham alleged that he was transferred because he refused to corroborate the false accusations against Caleb. HISD also attempted to terminate Cockerham's employment. After a hearing, an Independent Hearing Officer found for Cockerham and refused to terminate him. Grier allegedly refused to reinstate Cockerham or allow him to be rehired for the following school year. Consequently, Cockerham was unemployed until 2011, when Grier allowed him to be reemployed by HISD.

On January 20, 2010, Banks was told to appear at HISD's Administration Building, where Kroger interviewed her. On February 25, 2010, Banks was told to schedule another meeting with Kroger. At that meeting, she was questioned regarding the allegations of cheating on the TAKS exam. It is alleged that Majlat and the others "suggest[ed] that Adebayo had caused cheating," and that Majlat and the others "coax[ed] Banks to confirm [Adebayo's] participation." On April 8, 2010, Grier notified HISD's board that he recommended Banks be terminated for insubordination, violating district policies, falsifying records, and other offenses. On July 22, 2010, a hearing was conducted by an Independent Hearing Officer regarding Banks's termination. At the conclusion of the hearing, the hearing officer completely exonerated Banks. But because Banks was "deeply disturbed and distrustful of Defendants herein," she "believed [that] she was forced to resign from HISD in order to save her career."

Lenton was interviewed by Frizell on December 7, 2009. Frizell explained that the purpose of the interview was to determine what happened when the property was moved on October 31, 2009. On December 15, 2009, Lenton met with Frizell, Majlat, and others for a second time. During this meeting, Lenton was asked by **\*232** Majlat if Caleb had taken anything from Key. At this meeting, Majlat and Frizell allegedly called Lenton a liar and accused him of using drugs and alcohol. Lenton stated that he was not going to lie about Caleb to save his job. In October 2010, Lenton alleges that he was terminated, after an independent hearing, for refusing to make false statements about Caleb's involvement in the alleged misappropriation of school district property.

On March 2, 2012, Appellants filed their original complaint. On August 29, 2012, the plaintiffs filed their "Corrected Third Amended Original Complaint," the operative complaint for purposes of this appeal, alleging First Amendment retaliation claims, due process claims, and an equal protection claim. Appellees filed motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

On October 1, 2013, the district court dismissed all of the claims made by Banks, Lenton, and Cockerham. [2] Furthermore, the district court dismissed all of Caleb's claims against Kroger, Frizell, and Majlat, and her equal protection claim against Grier. However, the court did not dismiss all of Caleb's claims against HISD and Grier. On September 5, 2013, Appellees filed a joint motion for certification and entry of final judgment pursuant to Federal Rule of Civil Procedure Rule 54(b). On October 14, 2013, the district court granted in part and denied in part the Appellees' motion. The district court entered final judgment as to all of the claims made by Banks, Lenton, and Cockerham. Furthermore, the district court entered final judgment as to all claims made by Caleb against Kroger, Frizell, and Majlat. However, the district court did not enter final judgment as to the claims made by Caleb against HISD and Grier, noting that "Caleb's remaining claims against Grier and HISD in this case at least tangentially relate to ... much of the same set of facts as the dismissed claims." Accordingly, Caleb's claims made against HISD and Grier are not a part of this appeal. [3]

[2]    The district court also dismissed all claims made by another plaintiff, Jackie Anderson; however, her claims are not a part of this appeal.

[3]    For this reason, we do not address Caleb's equal protection cause of action.

## II. Standard of Review

"This court reviews a district court's dismissal under Rule 12(b)(6) de novo, accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." Dorsey v. Portfolio Equities, 540 F.3d 333, 338 (5th Cir.2008) (internal quotation marks omitted). In order to survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Although a complaint "does not need detailed factual allegations ... [the] allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555, 127 S.Ct. 1955 (internal citations omitted). Furthermore, "dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief." Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir.1995) (internal quotation **233** marks, citation, and brackets omitted). Finally, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." Beavers v. Metro. Life Ins. Co., 566 F.3d 436, 439 (5th Cir.2009) (internal quotation marks and citation omitted).

## III. Freedom of Speech Claims

Appellants have failed to plead sufficient facts to state a First Amendment free speech retaliation claim. In order to sufficiently plead such a claim, Appellants must have alleged facts that show: (1) they "suffered an adverse employment decision; (2) [their] speech involved a matter of public concern; (3) [their] interest in commenting on matters of public concern ... outweigh[s] the [Appellees'] interest in promoting efficiency; and (4) [their] speech motivated the adverse employment decision." Beattie v. Madison Cnty. Sch. Dist., 254 F.3d 595, 601 (5th Cir.2001) (internal citations and quotation marks omitted). In other words, a plaintiff must plead facts to show that he "engaged in protected conduct and that it was a motivating factor in [his] discharge." Id. Further, a plaintiff who is a public employee must show that he spoke as a citizen, not as an employee pursuant to his official duties. That is because while "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern," Garcetti v. Ceballos, 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), not all speech by public employees is protected by the First Amendment. For "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 421, 126 S.Ct. 1951; Williams v. Dallas Indep. Sch. Dist., 480 F.3d 689, 693 (5th Cir.2007) ( "These cases, when viewed as a whole, distinguish between

speech that is 'the kind of activity engaged in by citizens who do not work for the government,' and activities undertaken in the course of performing one's job. Activities undertaken in the course of performing one's job are activities pursuant to official duties." (internal citation omitted) (quoting *Garcetti,* 547 U.S. at 423, 126 S.Ct. 1951)). However, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane v. Franks,* 573 U.S. ——, 134 S.Ct. 2369, 2379, 189 L.Ed.2d 312 (2014). Accordingly, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* We first address Caleb's First Amendment claims separately from those of Cockerham, Banks, and Lenton.

 **[1]**    Caleb has failed to state a claim under section 1983 for First Amendment retaliation. We begin by noting that only Caleb's claims against Kroger, Frizell, and Majlat are before us as part of this appeal; the district court has not entered final judgment as to Caleb's claims against HISD and Grier. Generally speaking, in order to state a claim under section 1983, the plaintiff must show that the defendant's challenged conduct constituted "state action." *Rundus v. City of Dallas,* 634 F.3d 309, 312 (5th Cir.2011); *see Blum v. Yaretsky,* 457 U.S. 991, 1002, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). The state action requirement preserves the "essential dichotomy" set forth in the Fourteenth Amendment between a deprivation of rights by the state, "subject to scrutiny under its provisions, and private conduct, 'however discriminatory or wrongful,' **\*234**  against which the Fourteenth Amendment offers no shield." *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 349, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (quoting *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948)). While the Supreme Court has pronounced several legal tests for determining whether challenged conduct is state action, the core inquiry asks whether the deprivation of a federal right is fairly attributable to the State. *See Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 295–96, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). The Supreme Court has described a two-part approach to resolving that issue: first, "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or a person for whom the State is responsible;" second, "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

"In the typical case raising a state-action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action." *NCAA v. Tarkanian,* 488 U.S. 179, 192, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988). Yet this is not the typical case. Here, Caleb alleges that Kroger, Frizell, and Majlat violated her First Amendment rights merely by recommending her termination by HISD based on protected speech; it was HISD that did the actual firing. We hold that these allegations are insufficient to hold Kroger, Frizell, and Majlat liable as state actors.

In *NCAA v. Tarkanian,* the Supreme Court confronted a similar situation. The NCAA, a private association, investigated the recruiting practices of Tarkanian, the basketball coach at the University of Nevada Las Vegas ("UNLV"), a public university. *Tarkanian,* 488 U.S. at 185–86, 109 S.Ct. 454. Based on the NCAA's recommendation that Tarkanian be disciplined for violations of the NCAA's recruiting rules, UNLV suspended Tarkanian, in part to avoid further sanctions threatened by the NCAA if UNLV did not adopt its recommendation. *Id.* at 186–87, 109 S.Ct. 454. Tarkanian sued the NCAA under section 1983. *Id.* at 187–88, 109 S.Ct. 454. The Supreme Court noted that the case presented a unique question, given that the private entity, the NCAA, did not "take[ ] the decisive step that caused the harm to the plaintiff." *Id.* at 192, 109 S.Ct. 454. Therefore, the question was not "whether UNLV participated to a critical extent in the NCAA's activities, but whether UNLV's actions in compliance with the NCAA rules and recommendations turned the NCAA's conduct into state action." *Id.* at 193, 109 S.Ct. 454. The Court held that they did not. *Id.* at 199, 109 S.Ct. 454. The Court relied on the fact that the NCAA could not "directly discipline Tarkanian or any other state university employee;" rather, the decision to adopt the recommendation of the NCAA was the university's. *Id.* at 197, 109 S.Ct. 454. The same distinction applies here. Kroger, Frizell, and Majlat are not alleged to have had any power to discipline HISD employees. Rather, the conduct of which Caleb complains is a mere recommendation to HISD that she be disciplined—a recommendation that HISD was free to accept or reject. As such, the Supreme Court's reasoning in *Tarkanian* leads to the conclusion that Kroger, Frizell, and Majlat were not state actors, at least as far as Caleb's claims are concerned.

 **\*235**  To be sure, there are facts in *Tarkanian* that are distinguishable from this case. In *Tarkanian,* the Court noted that, in the posture of the NCAA investigation, the NCAA and UNLV were antagonists, comparing the situation to that

of public defenders, held not to be liable as state actors in *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). *Id.* at 196, 109 S.Ct. 454 ("[T]he NCAA is properly viewed as a private actor at odds with the State when it represents the interests of its entire membership in an investigation of one public university."). In contrast, here HISD commissioned the internal investigation itself. Further, unlike in *Tarkanian,* HISD used its governmental powers to facilitate the investigation by having administrators summon Appellants to meetings with Kroger, Frizell, and Majlat. *See id.* at 197, 109 S.Ct. 454 ("[The NCAA] had no power to subpoena witnesses, to impose contempt sanctions, or to assert sovereign authority over any individual."). Yet other distinctions are countervailing. In *Tarkanian,* the NCAA was able to coerce the university, through sanctions and possible expulsion from the association, to adopt its recommendation. *Id.* at 198, 109 S.Ct. 454. Here, Kroger, Frizell, and Majlat had no authority over HISD, much less the ability to impose sanctions. On balance, we are not persuaded that these distinctions affect the fundamental consideration in *Tarkanian,* which was that the NCAA's recommendation was not the decisive step that caused the harm to the plaintiff—rather, UNLV retained decision-making authority to discipline its employee. *See id.* at 197–98, 109 S.Ct. 454.

We also note that, even where the private party's act did not itself deprive the plaintiff of his constitutional rights, a showing of "joint action" would likely be sufficient to find state action. *See id.* at 197 n. 17, 109 S.Ct. 454. The joint action test provides that a private person can be held liable as a state actor where "he is a willful participant in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). This test generally requires a showing of a conspiracy between the private party and the state official. *See id.; Dennis v. Sparks,* 449 U.S. 24, 28–29, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). Yet Appellants expressly waived any argument for state action based on a conspiracy between Kroger and HISD in their response to Kroger's Third Rule 12(b)(6) Motion to Dismiss before the district court when they conceded that their conspiracy argument "has been abandoned explicitly." An appellant who abandons an argument before the district court may not resurrect it on appeal. *MacArthur v. Univ. of Tex. Health Ctr. at Tyler,* 45 F.3d 890, 896 (5th Cir.1995) ("[W]e must dismiss this appeal ... on the basis that the one claim that [the plaintiff] raises—Title VII retaliation—was abandoned at the district court, thus is not embodied in the district court judgment, and consequently is not before this court on appeal.").

We also respectfully reject the district court's reasoning in finding state action—that Kroger, Frizell, and Majlat were "performing duties normally 13 carried out by HISD staff." The Supreme Court's "holdings have made clear that the relevant question is not simply whether a private group is serving a 'public function.' " *Rendell–Baker v. Kohn,* 457 U.S. 830, 842, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). Rather, "the question is whether the function performed has been 'traditionally the *exclusive* prerogative of the state.' " *Id.* (quoting *Jackson,* 419 U.S. at 353, 95 S.Ct. 449). Appellants cite no authority for the proposition that internal investigations of employee misconduct are traditionally the exclusive **\*236** prerogative of the state. Rather, they merely allege that, in practice, internal investigations are generally conducted by HISD itself. But the fact that a state elects to perform a public service itself does not make such a service "traditionally the exclusive prerogative of the state." *See Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. 2764 (emphasis omitted). As such, we hold that Appellants have failed to plead sufficient facts to show that Kroger, Frizell, and Majlat were state actors because they were performing functions traditionally exclusively reserved to the state. [4]

[4]     Tangentially related is Texas Education Code Section 44.031(f), which allows school districts to hire outside attorneys without going through the normal bidding process for awarding contracts.

Given the foregoing, we conclude that the recommendation by Kroger, Frizell, and Majlat as to Caleb was not state action. As such, Caleb has failed to state a section 1983 claim against Kroger, Frizell, and Majlat.

 **[2]**     Cockerham, Banks, and Lenton have also failed to state a claim for First Amendment retaliation, because their speech was made pursuant to their official duties. In their complaint, Cockerham, Banks, and Lenton alleged that they exercised free speech when they refused to agree with purportedly false accusations made against Caleb in their interviews by Appellees. [5] But they also allege that they were ordered by HISD officials to take part in those interviews. Furthermore, the plaintiffs have pled facts that show that these meetings were directly related to their employment. The interviews concerned allegations of cheating on state standardized tests and misappropriation of school property. Accordingly, it is undisputed that the speech at issue here was made within the chain of command and that it was related to the employees' jobs, which are both factors that this

court has previously considered in determining that speech was made as an employee and not as a citizen. *See, e.g., Davis v. McKinney,* 518 F.3d 304, 313 (5th Cir.2008) ("Cases from other circuits are consistent in holding that when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job."). Further, it seems obvious to state that assisting in an employer's investigation into workplace theft is ordinarily within the scope of an employee's job duties, equally so to state that it is ordinarily within the scope of a teacher's duties to ensure compliance with standardized testing procedures. That Cockerham, Banks, and Lenton were required to speak in the course of their assistance in the investigation did not "mean [their] supervisors were prohibited from evaluating [their] performance." *Garcetti,* 547 U.S. at 422, 126 S.Ct. 1951; *see also id.* at 424, 126 S.Ct. 1951 ("[T]he First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities."). As such, the speech that Cockerham, Banks, and Lenton have alleged as the basis for their employer's retaliation was made pursuant to their official duties. It is therefore outside the **\*237** ambit of First Amendment protection, and they have failed to state a claim on which relief may be granted.

5   That Appellants have alleged retaliation based on their refusal to speak does not affect the analysis. *See Riley v. Nat'l Fed'n of the Blind of N.C.,* 487 U.S. 781, 796–97, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) ("There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say.").

## IV. Free Association Claims

**[3]**   In order to state a claim for retaliation based on the First Amendment right to freedom of association, a plaintiff must show: "(1) he suffered an adverse employment action, (2) his interest in 'associating' outweighed the [employer's] interest in efficiency, and (3) his protected activity was a substantial or motivating factor in the adverse employment action." *Hitt v. Connell,* 301 F.3d 240, 246 (5th Cir.2002). The First Amendment protects two broad categories of association. *Roberts v. United States Jaycees,* 468 U.S. 609, 617, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). The first protects "choices to enter into and maintain certain intimate human relationships."

*Id.* Those intimate human relationships include marriage, the begetting and bearing of children, child rearing and education, and cohabitation with relatives. *See Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 545, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987). The second category is association for the purposes of engaging in other activities protected by the First Amendment, such as speech or the free exercise of religion. *United States Jaycees,* 468 U.S. at 618, 104 S.Ct. 3244.

If Cockerham's, Banks's, and Lenton's claimed association is to be protected under the First Amendment, it must fall under the first category. The types of association properly characterized as "intimate human relationships" are limited to "relationships that presuppose deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Wallace v. Tex. Tech Univ.,* 80 F.3d 1042, 1051–52 (5th Cir.1996) (internal quotation marks omitted). These relationships "are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *United States Jaycees,* 468 U.S. at 620, 104 S.Ct. 3244. The First Amendment "does not include a generalized right of social association." *Wallace,* 80 F.3d at 1051 (internal quotation marks omitted). For example, we have previously held that association in certain private clubs was protected under the freedom of association, but that a college basketball coach's relationship with his players was not. *See id.* at 1052. It therefore follows that "[r]elationships with colleagues ordinarily are not afforded protection as intimate associations." *Hernandez v. Duncanville Sch. Dist.,* No. 3:04 CV 2028 BH(B), 2005 WL 3293995, at *10 (N.D.Tex. Dec. 5, 2005) (citing *Swanson v. City of Bruce, Miss.,* 105 Fed.Appx. 540, 542 (5th Cir.2004) (unpublished)); *see also Martsolf v. Christie,* 552 Fed.Appx. 149, 152 (3d Cir.2013) (unpublished); *Colbert v. City of McKinney,* No. 4:12cv612, 2013 WL 3368237, at *7 (E.D.Tex. July 3, 2013).

Here, Cockerham, Banks, and Lenton have not alleged sufficient facts to state a freedom of association claim. They have alleged that they "exercised protected association with Caleb, in that they constituted members of what Majlat [had] characterized ... as Caleb's 'clique.' " However, without more, this "association" appears to be nothing more than a group of close work colleagues. While the complaint does allege that "Cockerham and Lenton were members of a small group

of individuals chosen by Caleb to ... move with her [to Kashmere]" and that Caleb was "highly selective of those with whom she chose to ... go with her to Kashmere," such selectivity is no different from any manager's **\*238** prudent hiring decisions. These allegations are consistent with a relationship amongst colleagues and fail to suggest an intimate relationship protected by the First Amendment.

 [4] Caleb's claims against Kroger, Majlat, and Frizell also fail. Caleb's freedom of association claim derives from the second category of protected association—association for political purposes. She alleges that her right to political association was violated as the Appellees retaliated against her for associating with a state representative, Representative Dutton, at the town hall meeting on November 12, 2009 and with HISD Board Member Carol Mims Galloway. Aside from conclusory allegations, the only facts asserted in the complaint that could plausibly be understood to relate to Caleb's relationships with these individuals are that Majlat stated that Caleb had "friends in high places" and that, if anyone reported her to the HISD board, Caleb would find out about it immediately. Yet even assuming those statements referred to Dutton and Galloway, merely noting that Caleb had those relationships does not plausibly suggest that Majlat, much less Frizell and Kroger, took any action against Caleb based on that association. As such, Caleb has failed to state a claim against Kroger, Frizell, and Majlat based on her First Amendment rights to freedom of association.

## V. Procedural Due Process Claims

 [5] Appellants have also failed to state a claim for violations of their procedural due process rights. We first note that, assuming the allegations in the complaint are true, Appellants were entitled to procedural due process protections. "It is now beyond any doubt that discharge from public employment under circumstances that put the employee's reputation, honor or integrity at stake gives rise to a liberty interest under the Fourteenth Amendment to a procedural opportunity to clear one's name." *Rosenstein v. City of Dallas, Tex.,* 876 F.2d 392, 395 (5th Cir.1989), *reh'g granted,* 884 F.2d 174, *reinstated* 901 F.2d 61 (5th Cir.1990) (en banc). Government officials do not violate the Fourteenth Amendment by "publicly disclosing charges against discharged employees," provided that they afford procedural due process protections that allow the implicated employees to clear their names. *Id.* "[A] liberty interest is infringed, and the right to notice and an opportunity to clear one's name arises, only when the

employee is 'discharged in a manner that creates a false and defamatory impression about him and thus stigmatizes him and forecloses him from other employment opportunities.' " *Bledsoe v. City of Lake Horn, Miss.,* 449 F.3d 650, 653 (5th Cir.2006) (quoting *White v. Thomas,* 660 F.2d 680, 684 (5th Cir.1981)). " '[T]he process due such an individual is merely a hearing providing a public forum or opportunity to clear one's name, not actual review of the decision to discharge the employee.' " *Hughes v. City of Garland,* 204 F.3d 223, 226 (5th Cir.2000) (quoting *Rosenstein,* 876 F.2d at 395).

In order to state a claim that their liberty interest to a name clearing hearing was infringed, Appellants must have alleged:

> (1) that [they were] discharged; (2) that stigmatizing charges were made against [them] in connection with the discharge; (3) that the charges were false; (4) that [they were] not provided notice or an opportunity to be heard prior to [their] discharge; (5) that the charges were made public; (6) that [they] requested a hearing to clear [their] name[s]; and (7) that the employer refused [their] request for a hearing.

*Id.* The district court did not err in dismissing the complaint for failure to state a **\*239** procedural due process claim, because the allegations in the complaint itself establish that Banks, Cockerham, and Lenton cannot meet the elements of the claim. To the contrary, Banks, Cockerham, and Lenton have alleged facts that show that they were given a hearing to address the charges associated with the investigation.

Cockerham has alleged that he was afforded an independent hearing and that the independent hearing officer refused to terminate him. Banks has pleaded that she received a two-day independent hearing where she had the opportunity to "proclaim[ ] the falsity of the charges against her." Furthermore, Lenton has alleged that he requested and received a due-process hearing before an independent hearing officer. Cockerham's, Banks's, and Lenton's failure to allege that they asked for and were refused a hearing is dispositive. *See Bledsoe,* 449 F.3d at 653 (plaintiffs must plead that they requested and were denied a name-clearing hearing). It is immaterial whether the Plaintiffs were given an opportunity to clear their names before the Kroger report was released. *See Campos v. Guillot,* 743 F.2d 1123, 1126 (5th Cir.1984) ("It is not necessary that the hearing occur prior to publication

of the stigmatizing charges." (quoting *Wells v. Hico Indep. Sch. Dist.,* 736 F.2d 243, 256–57 (5th Cir.1984))). As to Lenton's claim relating to the incident with White at his due process hearing, we do not address the issue as it was not adequately briefed. *See United States v. Scroggins,* 599 F.3d 433, 446 (5th Cir.2010) ( "A party that asserts an argument on appeal, but fails to adequately brief it, is deemed to have waived it." (internal quotation marks omitted)). Lenton cites no legal authority for his argument that not allowing White to be called at his hearing violated his due process rights, and, as such, it is waived. *See* Fed. R.App. P. 28(a)(8)(A) (stating that the argument must contain "appellant's contentions and *the reasons for them,* with *citations to the authorities* and parts of the record on which the appellant relies" (emphasis added)); *Scroggins,* 599 F.3d at 447 ("In addition, among other requirements to properly raise an argument, a party must ordinarily identify the relevant legal standards and any relevant Fifth Circuit cases." (internal quotation marks omitted)).

**[6]**    As to Caleb's claims, she has alleged no facts indicating that Kroger, Frizell, and Majlat had any ability, authority, or even influence to deny her access to a name-clearing hearing, much less that they did so. As such, she has failed to state a claim for violation of her procedural due process rights by Kroger, Frizell, and Majlat.

### VI. Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.

**All Citations**

598 Fed.Appx. 227, 316 Ed. Law Rep. 29, 2015 IER Cases 174,060

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MABLE CALEB,                         §
                                     §
     Plaintiff,                      §
                                     §
v.                                   §      CIVIL ACTION NO. H-12-675
                                     §
DR. TERRY GRIER and HOUSTON          §
INDEPENDENT SCHOOL DISTRICT,         §
                                     §
     Defendants.                     §

MEMORANDUM AND ORDER

     Pending are Defendants Houston Independent School District and Terry Grier's Motion for Summary Judgment and Entry of Final Judgment on All Claims (Document No. 136), Plaintiff's Motion for Leave to Amend Complaint to Reassert Dismissed Claims (Document No. 162), and Defendants Houston Independent School District and Terry Grier's Objections to Plaintiff's Summary Judgment Evidence (Document No. 165).   After carefully considering the motions, responses, reply, sur-reply, and applicable law, the Court concludes as follows.

I. Background

     Plaintiff Mable Caleb ("Plaintiff") was formerly employed by Defendant Houston Independent School District ("HISD") as the principal of Key Middle School ("Key") and later, of Kashmere High School ("Kashmere").   Plaintiff's Corrected Third Amended Original

15-20297.5607

Complaint--111 pages in length--alleges, in essence, that HISD's Superintendent, Defendant Dr. Terry Grier ("Grier," and together with HISD, "Defendants") targeted Plaintiff for dismissal because of things she said and people with whom she associated, and that he instituted a harassing investigation into her activities at Key and her transition when she was appointed principal at Kashmere.[1] HISD retained outside counsel, Elizabeth Mata Kroger ("Kroger") and her law firm, to conduct the investigation, which culminated in an extensive March 5, 2010 Investigation Report finding that Plaintiff and other HISD employees had engaged in improprieties including (1) removal of equipment from Key, (2) solicitation of contributions from teachers who wished to teach summer school classes, (3) unauthorized student-targeted fundraising activities, (4) nepotism and payroll discrepancies, and (5) testing improprieties relating to the 2009 administration of the Texas Assessment of Knowledge and Skills ("TAKS") test.[2]

Grier testifies in his Declaration that based on the findings of the Investigation Report, he decided to terminate Caleb.[3] On or about March 9, 2010, a <u>Houston Chronicle</u> reporter made a request under the Texas Public Information Act for the Investigation

---

[1] Document No. 48-1 (Pls.' Corrected 3d Am. Orig. Compl.).

[2] Document No. 136, ex. C-4.

[3] <u>Id.</u>, ex. A ¶ 11.

15-20297.5608

Report, pursuant to which Grier released the Report.[4]  On March 22, 2010, Caleb made a written 10-page response to HISD to rebut the findings of the Investigation Report and delivered to HISD a separate letter, also dated March 22, 2010, notifying Defendants of her intent to retire effective August 31, 2010 "due to personal and family medical issues."[5]  Plaintiff released her 10-page response to The Houston Chronicle (the "Chronicle") as an "open letter," and the Chronicle on March 22, 2010 published an article that quoted extensively from the written response denying the allegations of wrongdoing and stated that Plaintiff had given notice to retire.[6] On April 8, Grier recommended to HISD's Board (the "Board") that it terminate or non-renew the contracts of Caleb and several other Key employees based on the Investigative Report's findings, and the Board terminated Caleb.[7]

In cooperation with Defendants and Kroger, the Texas Education Agency launched a separate investigation into the TAKS testing improprieties, and ultimately sought to revoke Caleb's teaching certificate.[8]  After a hearing, the State Office of Administrative Hearings concluded that "a severe breach of testing security and

---

[4] Id., ex. A ¶ 12.

[5] Document No. 160, ex. 20 at 3 of 5; id., ex. 35.

[6] Id., ex. 10.

[7] Document No. 136, ex. A ¶ 14; id., ex. A-5.

[8] Document No. 160, ex. 33 at 5 of 63.

15-20297.5609

confidentiality" had occurred, but that Plaintiff "did not commit any act or fail to take any action as principal of [Key] that resulted in a breach of test security."[9]

Plaintiff, together with four other HISD employees who had been subjects of HISD's investigation, filed this suit against Defendants, Kroger, and two of Kroger's investigators.[10]   After several rounds of amendments and motions to dismiss, the Court on June 13, 2013 dismissed all claims "except only for Plaintiff Caleb's claims that Defendants HISD and Terry Grier retaliated against her for making protected speech to The Houston Chronicle in response to the report published regarding her alleged misconduct, and Plaintiff Caleb's claim that Defendants HISD and Grier deprived her of her liberty interest by denying her a procedural due process hearing to clear her name."[11]   The Court then entered a Final Judgment dismissing all claims of the plaintiffs other than Plaintiff Caleb, and dismissing all of Plaintiff Caleb's claims against all defendants other than Grier and HISD.[12]   The Fifth Circuit affirmed the decision on appeal.[13]

---

[9] Id., ex. 33 at 5 of 63, 59 of 63.

[10] Document No. 1 (Orig. Compl.).

[11] Document No. 98 at 25.

[12] Document No. 114.

[13] Caleb v. Grier, No. 13-20582, 2015 WL 66478 (5th Cir. Jan. 6, 2015) (found at Document No. 145).

15-20297.5610

Defendants now move for summary judgment on Plaintiff's two remaining claims, arguing that (1) Plaintiff's First Amendment retaliation claim fails because her speech to the Chronicle was not a substantial or motivating factor in her termination, (2) Plaintiff's due process claim fails because she did not request a name-clearing hearing, (3) there is no evidence of an HISD Board of Trustees' unconstitutional policy or practice that could subject HISD to liability under § 1983, and (4) Grier is protected by qualified immunity.[14]   Plaintiff responds to Defendants' motion and also moves for leave to amend her complaint and reassert her dismissed claims against Defendants.[15]

## II. Plaintiff's Motion for Leave to Amend

Plaintiff seeks leave to amend her complaint to reassert the following claims which were dismissed in June 2013:  (1) Plaintiff's First Amendment retaliation claim based on her November 12, 2009 speech at a town hall meeting, (2) Plaintiff's First Amendment retaliation claim based on her November 13, 2009 speech in a private meeting with Grier, (3) Plaintiff's First Amendment freedom of association claim based on her political associations, and (4) Plaintiff's Equal Protection claim.[16]   Defendants oppose the

---

[14] Document No. 136.

[15] Document Nos. 158, 162.

[16] Document No. 162.

15-20297.5611

motion, arguing that (1) Plaintiff has previously had multiple opportunities to cure pleading deficiencies and failed to do so, (2) Plaintiff unnecessarily delayed seeking leave to amend, (3) amendment would be futile, and (4) Defendants would be severely prejudiced if amendment is allowed.[17]

Plaintiff's motion is largely a second motion for reconsideration of the Court's Order of June 13, 2013.[18] Plaintiff's previous motion for reconsideration, entitled "Motion for New Trial,"[19] was denied by Order dated September 3, 2013.[20] In the previous motion, as here, Plaintiff complains about dismissal of her November 12, 2009 and November 13, 2009 public speech claims, and of her freedom of association claim. Serial motions for reconsideration are not favored, and here there is only a rehash of what previously was considered. *See* LeClerc v. Webb, 419 F.3d 405, 412 n.13 (5th Cir. 2005) ("A motion for reconsideration may not be used to rehash rejected arguments or introduce new arguments.").

Plaintiff already has been allowed multiple amendments, and failed to correct the deficiencies despite two earlier rounds of

---

[17] Document No. 166.

[18] Document No. 98.

[19] Document No. 101.

[20] Document No. 108.

15-20297.5612

motions to dismiss.[21]  *See, e.g.*, <u>Herrmann Holdings Ltd. v. Lucent Techs. Inc.</u>, 302 F.3d 552, 566 (5th Cir. 2002) (affirming denial of leave to replead where plaintiff already had twice been given leave to amend).  For all of these reasons, as well as the inexplicable filing of the motion more than 20 months after the claims were dismissed and the unfair prejudice that Defendants would suffer if long-since dismissed claims were now resurrected, Plaintiff's Motion for Leave to Amend is denied.

### III.  <u>Defendants' Evidentiary Objections</u>

Defendants object to several exhibits attached by Plaintiff to her Response to Defendants' Motion for Summary Judgment.[22]

Defendants' objection to the "Rhetorical Analysis" of Dr. Kevin Cummings (Plaintiff's Exhibit 12) is SUSTAINED because Dr. Cummings was not timely disclosed as an expert; moreover, the Court previously denied as untimely Plaintiff's attempt to name Dr. Cummings as an expert witness.[23]  *See* FED. R. CIV. P. 37(c)(1)

---

[21]  *See* Document No. 98 at 1 n.1 (June 13, 2013 Memorandum and Order dismissing most of Plaintiff's claims) ("In light of Plaintiffs' prior filings of complaints--the *Third Amended* Complaint is now under review--and with no consequential transactions, occurrences, or events having occurred after Plaintiffs filed their current pleading of more than 100 pages in length, the Motion to file Supplement (Document No. 92) is DENIED.") (emphasis in original).

[22]  Document No. 165.

[23]  Document No. 98 at 1-2 n.1 ("Plaintiffs' Motion for Leave to File Designation of Expert Witness (Document No. 83), which is

15-20297.5613

("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

Defendants' hearsay objection to newspaper articles that are Plaintiff's Exhibits 11, 22, 29, 30, and 31 is SUSTAINED, and the articles are excluded as evidence of the truth of the matters asserted therein; but the objection is OVERRULED as to Plaintiff's limited offers for the purposes of showing newspaper coverage of HISD events and exhibiting articles about which Grier was questioned in his deposition.

Defendants' relevance objection to the affidavit of Carol Mims Galloway (Plaintiff's Exhibit 15), which Plaintiff admits "does not relate to facts of this case,"[24] is SUSTAINED.

Defendants' relevance and foundation objections are SUSTAINED as to Plaintiff's Exhibit 23, which includes an affidavit of Glen White and part of an affidavit of Tony Shelvin, both unrelated to Plaintiff, and unauthenticated documents relating principally to the investigation of Herbert Lenton.

---

opposed by Defendants HISD, Grier, and Kroger, is DENIED as having not been timely filed before the deadline for identifying expert witnesses expired.").

[24] Document No. 171 at 2.

8

15-20297.5614

Defendants' relevance objection to the affidavit of Sabrina Norman and news article at Plaintiff's Exhibit 25 is OVERRULED. Defendants' hearsay objection to the news article is SUSTAINED.

Defendants' relevance and foundation objections to the declaration of Rep. Harold Dutton (Plaintiff's Exhibit 2) are OVERRULED.

Those portions of the evidence to which objections are sustained are STRICKEN, and all remaining objections are OVERRULED.

## IV. <u>Motion for Summary Judgment</u>

### A. <u>Legal Standard</u>

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. <u>Morris v. Covan World Wide Moving, Inc.</u>, 144 F.3d 377, 380 (5th Cir. 1998). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. <u>Id.</u> "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." <u>Id.</u> "A party asserting that a fact cannot be or is

9

15-20297.5615

genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Id. 56(c)(3).

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." Id. Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." Anderson, 106 S. Ct. at 2513.

15-20297.5616

B.    Analysis

1.    First Amendment Retaliation

Plaintiff's First Amendment retaliation claim is that "Defendants HISD and Terry Grier retaliated against her for making protected speech [through her 'open letter'] to The Houston Chronicle in response to the report published regarding her alleged misconduct."[25]   This claim relates to a March 22, 2010 article written by Ericka Mellon in the Chronicle, reporting Plaintiff's announcement on that same date that she intended to retire.[26]   The article reported:

> HISD Superintendent Terry Grier said he had not seen Caleb's letter giving notice.   But he said he would discuss with the school district's attorneys whether to accept her retirement or to fire her sooner.   The school board would have to approve the termination, and it could end up in an expensive legal battle.[27]

After summarizing portions of Plaintiff's written response to the investigation, in which she maintained her innocence of any wrongdoing and characterized the investigation as a "personal attack" by Grier, the article concluded by quoting Grier: "'It's sad that she wants to blame me for this type of conduct at Key and

---

[25] Document No. 98 at 25.

[26] Document No. 159, ex. 10.

[27] Id., ex. 10 at 1.

11

15-20297.5617

at Kashmere,' Grier said. 'Nothing could be further from the truth.'"[28]

To establish a § 1983 claim for retaliation against protected speech, Plaintiff must show: (1) she suffered an adverse employment action; (2) she spoke as a citizen on a matter of public concern; (3) Plaintiff's interest in the speech outweighs the public employer's interest in efficiency; and (4) the speech precipitated the adverse employment action.[29] Nixon v. City of Houston, 511 F.3d 494, 497 (5th Cir. 2007). Once a plaintiff has shown that his protected speech "was a substantial or motivating factor in the defendant's adverse employment decision, a defendant may still avoid liability by showing, by a preponderance of the evidence, that it would have taken the same adverse employment action even in the absence of the protected speech." Haverda v. Hays Cnty., 723 F.3d 586, 591-92 (5th Cir. 2013) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 97 S. Ct. 568, 576 (1977)). "An employee can, however, refute that showing by presenting evidence that 'his employer's ostensible explanation for the discharge is

---

[28] Id., ex. 10 at 3.

[29] As noted in Court's June 13, 2013 Memorandum and Order, "[a]lthough [Plaintiff's] complaint does not cite 42 U.S.C. § 1983, Section 1983 is the statute that provides a private cause of action for redressing a violation of federal law or 'vindicating federal rights elsewhere conferred.'" Document No. 98 at 5 (citing Albright v. Oliver, 114 S. Ct. 807, 811 (1994)).

15-20297.5618

merely pretextual.'"   Id. at 592 (citing <u>Coughlin v. Lee</u>, 946 F.2d 1152, 1157 (5th Cir. 1991)).

Defendants do not dispute that Plaintiff suffered an adverse employment action when she was terminated by HISD on April 8, 2010, and the Court assumes--as Plaintiff insists--that Plaintiff spoke as a citizen on a matter of public concern, and that her interest in the speech outweighs HISD's interest in efficiency.[30]   Defendants argue, however, that there is no evidence that Plaintiff's speech to the <u>Chronicle</u> was a motivating factor in Grier's decision to recommend her termination; to the contrary, Grier wanted Plaintiff fired because he believed that her discharge was warranted by the findings of the Investigation Report.[31]   Plaintiff responds that the

---

[30] Defendants also "assum[e] *arguendo*" that Plaintiff's speech to the <u>Chronicle</u> was protected, but reurge in a footnote their argument--which the Court rejected when ruling on their motion to dismiss--that Caleb's speech is not protected because it concerned her individual employment and answered claims about her misconduct. Document No. 136 at 13, n.6.  Although "[s]peech that is primarily motivated by, or primarily addresses, the employee's own employment status *rather than a matter of public concern* does not give rise to a cause of action under § 1983," <u>Foley v. Univ. of Houston Sys.</u>, 355 F.3d 333, 341 (5th Cir. 2003) (emphasis added), Plaintiff's employment and the allegations against her had received extensive media coverage in this case after Defendants released video footage and the Investigation Report to the press.  Thus, viewing the evidence on summary judgment in the light most favorable to the non-movant, Plaintiff's evident release to the <u>Chronicle</u> of her written response to HISD may therefore arguably be characterized as addressing a matter of public concern.  *See* <u>Connick v. Myers</u>, 103 S. Ct. 1684, 1690 (1983) ("Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.").

[31] Document No. 136 at 14-21.

13

15-20297.5619

close timing between her speech to the <u>Chronicle</u> and her termination is sufficient to make out a *prima facie* case of retaliation, and that Grier's purported reliance on the Investigation Report is pretextual because the report "found the opposite of what Grier says he believed and for which he decided to terminate Caleb."[32]

Defendants first argue that "there is nothing in the record or Plaintiff's petition to indicate that Grier had seen the article at the time he decided to terminate Caleb, or before the Board vote on her termination."[33]  Grier testified in his deposition that he did not recall, but did not deny, his reported conversation with Mellon that resulted in her use of quotes attributed to him in the <u>Chronicle</u> article.[34]  However, Grier's quotes themselves raise an inference that he was aware--if only because of his conversation with Mellon--of at least some of Plaintiff's speech to the <u>Chronicle</u>; namely, that Plaintiff had submitted a notice of her intent to retire and that she "want[ed] to blame [Grier] for this type of conduct at Key and Kashmere."[35]  This evidence when construed in the light most favorable to Plaintiff is sufficient to

---

[32] Document No. 158 at 28.

[33] Document No. 136 at 15.

[34] Document No. 159, ex. 3 at Vol. 2, 78:1-79:7.

[35] <u>Id.</u>, ex. 10 at 3 of 6.

14

15-20297.5620

raise at least a fact issue that Grier had notice of Plaintiff's speech to the Chronicle before he recommended her termination.

Plaintiff produces no direct evidence that Defendants terminated her because of her speech to the Chronicle, and relies only on the close timing between her speech and termination. In evaluating a First Amendment retaliation claim, "[c]lose timing between an employee's protected activity and an adverse employment action can be a sufficient basis for a court to find a causal connection required to make out a prima facie case of retaliation." Mooney v. Lafayette Cnty. Sch. Dist., 538 F. App'x 447, 454 (5th Cir. 2013) (citing Evans v. City of Houston, 246 F.3d 344, 354 (5th Cir. 2001) (reversing summary judgment dismissal of Title VII retaliation claim)). "[T]emporal proximity between protected activity and an adverse employment action should be viewed in the context of other evidence. The causal connection prong, for example, may also be satisfied when the plaintiff relies upon a chronology of events from which retaliation may plausibly be inferred." Id. (citing Brady v. Houston Indep. Sch. Dist., 113 F.3d 1419, 1424 (5th Cir. 1997)) (footnote omitted).

The relevant chronology of events, according to Plaintiff, began in mid-November 2009, when "Grier, the relatively new Superintendent of HISD, was publically [sic] embarrassed by the community church rally where he was labeled a 'liar,' picketed, and

15

chided by Caleb."[36]  Plaintiff argues that shortly thereafter, Grier retained investigators "for the specific purpose of investigating of Caleb and Key Middle School," and that "Grier targeted Mable Caleb" in that investigation.[37] The uncontroverted summary judgment evidence is that the HISD investigation began after HISD received an anonymous complaint in November, 2009, concerning "funny business" at Key, stating that "many things are missing from the school," and encouraging examination of surveillance tapes on October 31, 2009, a Saturday.  When the tapes were examined persons were seen carrying various boxes and materials out of the audio visual rooms at Key, and Plaintiff is seen observing some of the activity.[38]   Two men--the plant operator at Kashmere and the Kashmere custodian--were seen exiting with various boxes and equipment that were placed in a truck driven away from Key.  Items removed included a desk, a leather chair, computer equipment in original boxes, metal cabinets in their original boxes, and also some personal items belonging to Plaintiff.

The Investigation Report was issued on March 5, 2010, the Chronicle article was published on March 22, 2010, and Plaintiff

---

[36] Document No. 158 at 25-26.  As noted above, Plaintiff attempts to reurge her dismissed retaliation claims based on these earlier events.

[37] Id. at 26.

[38] Document No. 136, ex. C-2.

16

was terminated at the April 8, 2010 Board meeting.[39]   Although Plaintiff was terminated fewer than three weeks after what Plaintiff refers to as her "open letter" to the Chronicle, Plaintiff's allegations and testimony--like her argument in opposition to summary judgment--have consistently claimed that Grier targeted Plaintiff for investigation and termination when Plaintiff and Grier had confrontations in the Fall of 2009, months *before* Plaintiff's letter to the Chronicle.[40]   Indeed, Plaintiff alleges that "Grier's personal hostility towards Caleb peaked on or about November 12-13, 2009," five months before she was discharged.[41]   Plaintiff's chronological narrative is thus at odds

---

[39] *See* id. ex. A-4 (notice of termination).

[40] *See* Document No. 159, ex. 1 at 70:24-71:24 ("Q. I'm really just trying to establish, do you have a belief as to why they started that investigation?  A. **[Plaintiff Ms. Caleb]** Yes.  Q. And what was that?  What is your belief?  Why did HISD begin that investigation?  A. The--I know that the investigation started, it was because I got Dr. Grier really upset after those community meetings and after the meeting with him and with him being so rude and unprofessional and making his statements, and I decided to stand up and speak up for myself.  And I believe that Dr. Grier, with the shouting and all he was doing in his office, never thought that I would just take a stand.  So I took a stand, told him how I felt.  And when he asked me about didn't I know that they were going to picket me, and I had an obligation to tell him, just one thing led to another and remarks that he made to me and with my response to him--or responses to him during that con--during that Friday evening meeting.  So I felt that it was retaliation or I did not bow down to his intimidation.  Q. And do you believe that the termination of your employment was for the same reasons?  A. Yes, I believe it was for the same reason.").

[41] *See* Document No. 48-1 at 13.

17

15-20297.5623

with her retaliation theory, namely, that it was Plaintiff's speech to the Chronicle that caused Grier to seek her termination.

Regardless, assuming the temporal proximity between Plaintiff's speech to the Chronicle and her termination were sufficient to make out a *prima facie* case of retaliation, Plaintiff has presented no evidence to show that Defendants' proffered legitimate reason for her termination was pretextual. *See* Haverda, 723 F.3d at 591-92. Plaintiff was terminated after Defendants received an extensive investigation report which concluded that Plaintiff had engaged in numerous instances of misconduct including mismanagement of fixed assets resulting in tens of thousands of dollars in missing computer equipment, inappropriate student-targeted fundraising activities, misuse of Title I funds, misuse of HISD's resources and personnel, nepotism, and poor oversight of TAKS testing which resulted in cheating.[42]  Grier's uncontroverted declaration testimony is that

> I considered the report's findings of financial mismanagement and misconduct to be very serious.  Taken as a whole, the findings indicated to me that Ms. Caleb was not following district policies, was not properly managing the District's assets, and was not properly supervising campus staff.  Therefore, based on these findings, I made the determination that the District should initiate termination or nonrenewal proceedings against Ms. Caleb and several other Key staff.

* * *

---

[42] *See* Document No. 136, ex. C-4.

18

15-20297.5624

> After making the determination to terminate or non-renew Ms. Caleb and other employees, I became aware that Ms. Caleb submitted a request to retire at the end of her contract.   I chose to instead move forward with her termination because I believed at the time, and still do believe, that these findings evidence gross mismanagement and misconduct by Ms. Caleb.   I would do the same with any employee who I believed engaged in such serious misconduct.   In fact, I did do the same with Ms. Delores Westmoreland, who was the Dean of Instruction at Key Middle School during the time period at issue in the report.[43]

HISD's General Counsel Elneita Hutchins-Taylor testifies in her Declaration, "I was present when Ms. Mata-Kroger met with Dr. Grier and went over the findings of the investigation.   He expressed to me his belief that the report demonstrated that Ms. Caleb, among others, needed to be terminated."[44]

The further uncontroverted evidence is that Grier followed the same practice for each investigated employee implicated in gross mismanagement and/or misconduct and whom Grier recommended be terminated.   For example, the summary judgment evidence is that Ms. Westmoreland, Dean of Instruction at Key, was also implicated by the Investigation Report and, like Plaintiff, filed with HISD a response denying the findings and notifying HISD of her intent to

---

[43] Id., ex. A ¶¶ 11, 13.   See also Document No. 159, ex. 3 at Vol. 2, 64:12-20 ("Q. Now, do you recall what prompted you to make that--to make the decision to terminate her on April the 14th, 2010?  A. Basically, the result of the investigation that had been conducted. Q. The report?  A. Uh-huh.  Q. The Mata Kroger report? A. Yes.").

[44] Document No. 136, ex. C ¶ 7.

19

15-20297.5625

retire.  Unlike Plaintiff, however, Ms. Westmoreland did *not* speak to or release her response to the <u>Chronicle</u>.  Nonetheless, Grier recommended that she be terminated based on the Investigative Report's findings of misconduct, just as he recommended for Plaintiff.  On this summary judgment record, Defendants have met their burden to produce uncontroverted evidence that HISD had a legitimate reason for terminating Plaintiff and would have done so in the absence of her speech to the <u>Chronicle</u>.

Plaintiff responds that Grier's purported reliance on the Investigation Report is pretextual because "[i]f Grier believed the findings of the Report, however, he would have to believe that all the alleged assets, property, and computers, were accounted for-- *that is what the Report found*."[45]  Plaintiff's characterization of the Report is a demonstrable misstatement.  The paragraph of the Report cited by Plaintiff, read in context of the Report, states that after an unannounced physical inventory had been conducted at Key in December 2009, in which there were found missing 21 of 55 CPUs acquired by Key in June, 2009 under P.O. No. 4501361495, a subsequent physical inventory was taken on January 13, 2010, in which "all twenty-one (21) previously unaccounted for CPUs were located at Key."[46]  This finding cited by Plaintiff for her argument that "all the alleged assets . . . were accounted for" is a

---

[45] Document No. 158 at 28 (emphasis in original).

[46] Document No. 136, ex. C-4 at 15.

20

15-20297.5626

reference to equipment acquired by only *one* of *eight* recent purchase orders that were listed in the Report.  The Investigation Report's "Summary of Missing Fixed Assets"--ignored by Plaintiff-- reports the findings of HISD's Property Management Department after it was asked to locate at Key fixed assets on *eight* purchase orders, which assets were received during the final seven months that Plaintiff was principal at Key, from December 2008 through June 2009.  (Ms. Caleb was appointed principal of Kashmere on June 29, 2009.)  After identifying the eight purchase orders by number (only one of which was P.O. 4501361495, the one referred to in Plaintiff's argument), the Report summarizes:

> The physical inventory related to these eight (8) PO's revealed missing equipment with a total original cost of $36,645.00.[47]

Plaintiff's argument that the Report found that "all of the alleged [missing] assets, property, and computers, were accounted for" has no factual basis in the summary judgment record.[48]

---

[47] Id., ex. C-4 at 20.

[48] The details of the missing and later-found CPUs on this one Key purchase order referred to by Plaintiff are perplexing, to say the least.  An unannounced physical inventory was conducted at Kashmere on December 4, 2009, which turned up some but not all of the missing items on this Key purchase order.  After that December 4 physical inventory at Kashmere, the missing Key Item No. 5 (a CPU)) "was later found in its original box in Ms. Caleb's office at Kashmere," and missing Key Item Nos. 8 and 9 (HP monitors) "were later found the following week on December 10, 2009, in their original boxes in Ms. Caleb's office at Kashmere." All of the 21 "previously unaccounted for CPUs [found] located at

15-20297.5627

It is uncontroverted that the Investigative Report presented to Superintendent Grier, consisting of approximately 87 pages, was the product of a three months' investigation by outside counsel, who interviewed more than 50 witnesses and other individuals during the course of the investigation.  It was this report that Grier states he relied upon when he determined that Caleb should be fired.  Excerpts from the Executive Summary, at pages 2-4 of the Investigative Report, evidence the kinds of findings made with respect to Plaintiff and those whom she was charged to manage:

> Mable Caleb, Key's former principal, and others at Key often stated during their interviews that their first priority was "the children" of Key and their protection and education.  Unfortunately, the acts and omissions of several at Key belie these stated sentiments.  Key students were seemingly not the priority when fixed assets and other resources purchased for their education were not properly safeguarded or managed.  Thousands of dollars of Key equipment is either missing or unaccounted for and was never reported missing, lost or stolen.  The inventory signed and submitted by Ms. Caleb in March 2009 denotes over $200,000 of equipment as "Lost During Move," referring to Key's move during the mold remediation at the school in the 2007-2008 school year.  The move, however, had occurred 12 months prior to Key's submission of the inventory to the District and missing equipment was denoted as "Lost During Move" even though [the equipment] was received *after* the move.  In addition, tens of thousands of dollars of recently purchased equipment for Key students is also missing; this amount does not include the value of the fixed assets purportedly borrowed for use at Kashmere.

> * * *

Key" on January 13, 2010 were items acquired on this one purchase order in June 2009.

22

15-20297.5628

District policies were regularly ignored at Key and there were seemingly no effective checks and balances so that violations of policy could be promptly detected, reported and addressed:  a grossly inadequate inventory of Key's fixed assets was not detected when it was submitted, and thousands of dollars of District funds and grant money were used to purchase banned food items which were not only available to students in violation of State and District guidelines but actually sold to these students for profit.  How much money was raised from student-targeted fundraising at Key and what happened to it remains a mystery.

Other forms of mismanagement and misconduct were also found.  Nepotism resulted in Ms. Caleb's niece, Elgie Wade, earning an additional 75% of her base pay, in the 2008-2009 school year, through overtime, extended pay and summer school work.  No one else in the school received such favorable treatment.  Moreover, the evidence reflects that at Ms. Caleb's direction, overtime was paid to Ms. Wade regardless of hours reflected on the District's sign-in sheets.  In addition, Ms. Caleb's son was allowed to work in a federally-funded summer school program and during summer school at Key while Ms. Caleb was still the principal, in violation of the District's rules prohibiting nepotism.

* * *

The evidence reflects that there was a pattern and practice of gross mismanagement and abuse of authority by Key administration including Mable Caleb, Bernett Harris, and Peggy Collins.  Other Key employees participated by distributing live TAKS tests and misrepresenting their credentials during this investigation (Richard Adebayo), attempting to obstruct the investigation (Herbert Lenton), participating in a fraud on the school district by accepting compensation for hours not documented as worked and misuse of the PROCARD (Elgie Wade), failing to oversee the proper administration of the TAKS testing as well as misuse of the PROCARD (Dolores Westmoreland), and failing to properly oversee special education services at Key (Jackie Anderson).

There was no credible evidence found that the unauthorized activities and policy violations taking place at Key were done with students' interests in mind (as suggested by some witnesses).  Rather, the evidence

15-20297.5629

> suggests that the students and the many hard working teachers who labor on their behalf were not the priority for Key's administration.[49]

Plaintiff has failed to present any evidence sufficient to raise a fact issue that Superintendent Grier's declared reliance upon this Investigative Report for concluding that Caleb should be discharged was pretextual and that the real reason was because Caleb had in her "open letter" to the Houston Chronicle stated that the allegations were false, that she was wrongfully targeted, and that she was announcing her intention to retire.[50]   Because there is no fact issue on pretext, and because Defendants have met their burden to establish a legitimate reason for terminating Plaintiff and that they would have done so in the absence of her speech to The Houston

---

[49] Document No. 136, ex. C-4 at 2-4.

[50] Plaintiff relies on Guerra v. Roma Indep. Sch. Dist., 444 F. Supp. 812 (S.D. Tex. 1977), in which the court found after a bench trial that the school district's proffered explanation for termination and demotion was pretextual where "the only credible explanation for the nonrenewal and/or demotion of these four teachers was their relationship with Arnulfo Guerra, a political opponent of three recently elected board members and of their Old Party leader."   Id. at 819.   However, in Guerra, "[a]ll four teachers in question were praised by their supervisors; both their principal and their superintendent recommended that their three-year contracts be renewed," and "[n]o dissent from these evaluations or recommendations came in evidence.  Yet without any contrary recommendation, without any discussion or any vote, those recommendations were not followed."   Id. at 820.   Here, in contrast, the Investigation Report provides a compelling basis for Plaintiff's termination, and the uncontroverted evidence is that Defendants terminated her because of the report's findings.

24

15-20297.5630

Chronicle, Defendants are entitled to summary judgment on Plaintiff's First Amendment retaliation claim.

2.    Liberty Interest Due Process Violation

Plaintiff's remaining claim is that Defendants deprived her of her liberty interest by denying her a procedural due process hearing to clear her name.[51]  To prevail on such a claim, Plaintiff must show:  (1) that she was discharged; (2) that stigmatizing charges were made against her in connection with the discharge; (3) that the charges were false; (4) that she was not provided notice or an opportunity to be heard prior to her discharge; (5) that the charges were made public; (6) that she requested a hearing to clear her name; and (7) that the employer refused her request for a hearing.  Hughes v. City of Garland, 204 F.3d 223, 226 (5th Cir. 2000).  Plaintiff admits that she never requested a name-clearing hearing.[52]  Accordingly, Defendants are entitled to summary judgment on Plaintiff's liberty interest due process claim. See Bledsoe v. City of Horn Lake, Miss., 449 F.3d 650, 653 (5th

---

[51] Document No. 98 at 25-26.

[52] Document No. 159, ex. 1 at Vol. 102:13-17 ("Q. Let me ask it again because I'm not sure.  Did you make a request for a name-clearing hearing to HISD?  [Objection.]  A. No.").  See also Document No. 136, ex. C ¶ 12 ("At no time did Ms. Caleb request a name clearing hearing to defend the conclusions contained in Ms. Kroger's report.").

15-20297.5631

Cir. 2006) ("Bledsoe's undisputed failure to request a hearing defeats his liberty interest claim.").[53]

## V. Order

For the foregoing reasons, it is

ORDERED that Defendants Houston Independent School District and Terry Grier's Motion for Summary Judgment and Entry of Final Judgment on All Claims (Document No. 136) is GRANTED, and Plaintiff Mable Caleb's claims are DISMISSED with prejudice.  It is further

ORDERED that Plaintiff's Motion for Leave to Amend Complaint to Reassert Dismissed Claims (Document No. 162) is DENIED.

The Clerk shall notify all parties and provide them with a true copy of this Order.

SIGNED at Houston, Texas, on this 29th day of April, 2015.

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

---

[53] *See also* <u>Caleb v. Grier</u>, 2015 WL 66478, at *10 (Fifth Circuit's opinion affirming dismissal of co-plaintiffs' claims in this case) ("Cockerham's, Banks's, and Lenton's failure to allege that they asked for and were refused a hearing is dispositive.").

26

15-20297.5632